Brenda MOMBOURQUETTE, by her guardian Tammy MOMBOURQUETTE, E.S. (a minor), and C.S. (a minor), Wisconsin Department Of Health And Family Services, Plaintiffs,

v.

Charles AMUNDSON, Individually in his supervisory capacity, Jeanne Reinart, Individually, Candace Warner, Individually, David Schaldach Individually, Sandi Wegner, Individually, Anna Janusheske, Individually, Mike Wildes, Individually, Janita Leis, Individually, Sue Wieman, Individually, and Patricia Fish, Individually, Defendants.

No. 05–C–748–C.

United States District Court, W.D. Wisconsin.

Jan. 12, 2007.

 

Michael Devanie, Devanie & Belzer, S.C., La Crosse, WI, for Plaintiffs.

Charles H. Bohl, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for Defendants.

### ORDER

CRABB, District Judge.

Plaintiff Brenda Mombourquette attempted to commit suicide by hanging herself with a bed sheet while she was detained in the Monroe County jail. Although two previous attempts of self harm several days earlier did not cause long lasting injury, plaintiff was left seriously brain damaged after she made a third attempt. Plaintiff brought this suit under 42 U.S.C. § 1983 through her sister and children against various jail staff members, who plaintiffs believe violated Brenda Mombourquette's constitutional rights when they failed to protect her from harming herself. (For the remainder of the opinion, I will refer to plaintiff Brenda Mombourquette simply as "plaintiff" because most facts relevant to summary judgment relate to her solely.) Each of the defendants moved for summary judgment in three different groups: (1) defendants Charles Amundson, Candace Warner, Sandi Wegner, Anna Janusheske, Mike Wildes, Janita Leis, Sue Wieman and Patricia Fish; (2) defendant Jeanne Reinart and (3) defendant David Schaldach, who adopted the briefs and proposed findings of fact submitted by the other parties.

As an initial matter, it is important to understand the scope of plaintiff's claims. Although plaintiff does not say explicitly, it is clear from a review of her complaint, her brief opposing defendants' motions for summary judgment and her proposed findings of fact that her claim is directed at defendant's failure to prevent her attempted suicide on November 22, 2002. I do not understand plaintiff to be asserting a separate claim for the failure to prevent her from cutting her wrists on November 13. Rather, I understand her to be relying on facts surrounding that incident as evidence of defendants' deliberate indifference to her suicide attempt on November 22.

In addition to defendants' motions for summary judgment, two other motions are before the court: (1) plaintiff's motion to supplement her summary judgment materials with a document she obtained after filing her opposition brief; and (2) defendant Schaldach's "motion in limine" to exclude evidence that he engaged in sexual activity with another female inmate while plaintiff was detained at the Monroe County jail.

Both motions will be denied. With respect to the motion to supplement the record, plaintiff seeks to add a 2004 resignation letter from the jail administrator to defendant Charles Amundson. However, the document adds no new evidence to the record, so it is unnecessary to consider its admissibility. For reasons discussed further below, defendant Schaldach's motion in limine must be denied because plaintiff's complaint about Schaldach's misconduct may be relevant to show that both defendants Schaldach and Amundson were deliberately indifferent to plaintiff's health and safety.

Cases involving an unfortunate event like a jail suicide attempt are difficult for all parties involved. They are difficult as well for a judge or juror, who must resolve disputed issues on the basis of the law and not on feelings of sympathy either for plaintiffs, who have suffered greatly, or for defendants, who have a difficult and often thankless job. As is usually the case, the facts are not one-sided. However, I conclude that summary judgment is not appropriate with respect to any of the defendants because a reasonable jury could find that each of them was deliberately indiffer-

ent to a substantial risk that plaintiff would attempt to harm herself.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. *Sheriff Amundson and the Monroe County Jail*

Defendant Charles Amundson became sheriff of Monroe County in 2000. As sheriff, defendant Amundson has the obligation to "take the charge and custody of the jail maintained by the county and the persons in the jail." After Amundson was elected, he met with Wisconsin Department of Corrections jail inspector Scott Morris, who told Amundson that the jail was "very poorly run" and "poorly supervised." In particular, Morris believed that the jail lacked effective supervision and training of first line supervisors such as defendant David Schaldach, who was a lieutenant at the jail.

Mark Pressler became the jail administrator in February 2002. One problem he identified was a practice called "paper whipping," or a failure to perform cell checks. Pressler found that there were five to six hour gaps between cell checks, despite log entries indicating that checks were being performed regularly. Pressler reported numerous problems to Amundson regarding staff misconduct in 2002, including threats, vandalism and sexual misconduct with inmates. Amundson did not investigate any of these complaints. In Pressler's view, there was no supervision of the jail by Amundson and no accountability of the jail staff.

In October 2002, state jail inspector Morris issued a report to Amundson following an annual inspection of the jail that included the following criticisms:

· *Classification and housing of suicidal inmates:* "Proper segregation is of special concern in regards to housing high-risk inmates including those with mental health issues; those considered suicide risk, violent and combative inmates, and those with significant medical issues." Morris noted that it was the seventh consecutive year that the jail was in violation of a state law relating to segregation of inmates. (Defendant Amundson admits this was a "real problem" in 2002.)

· *Crisis intervention:* "At the present time, documented communication by crisis intervention personnel is not taking place. This communication is essential to insure proper continuity of care for the inmate, proper classification, and in addition to insure the proper supervision of inmates experiencing emotional or mental health crises." (Defendant Amundson did not know what the crisis intervention program was because, as he testified, he left "those type of things up to the jail administrator.")

· *Mental health screening reports:* "It is recommended that first line jail supervisors take a more active role in reviewing and approving reports for accuracy, completeness and legibility.... [M]edical and mental health screening reports ... continue to be an area in need of measurable improvement."

Morris concluded that staff needed training on "policies and procedures related to mental health access and treatment within the jail." Although Morris did conclude that there were "significant and measurable improvement ... in the overall operation of the jail," he credited these improvements to Pressler rather than defendant Amundson.

### B. *Defendants' Training*

Defendants Mike Wildes, Janita Leis, Patricia Fish, Sandi Wegner and Anna

Janusheske were correctional officers at the Monroe County jail in 2002. They were trained by the state of Wisconsin in accordance with the standards developed and maintained by the Law Enforcement Standards Board of the Wisconsin Department of Justice. That training program includes the following information about preventing suicides of incarcerated individuals:

· Suicides and suicide attempts are a significant problem in jails; the rate of suicide attempts of jail inmates may be nine times higher than society in general; pretrial detainees are at greater risk than sentenced inmates.

· Officers have a duty to make reasonable efforts to prevents inmates from killing themselves by (1) taking steps to determine possible suicide risk among inmates; and (2) taking steps to prevent inmates who may be or are suicide risks from attempting to commit suicide.

· Proper classification is the primary method for keeping inmates safe.

· Suicide watch is a common form of classification in jails. Aspects of suicide watch include placing the inmate in a certain housing area, removing certain items from the inmate's possession and checking on the inmate more frequently.

· Inmates who have exhibited suicidal tendencies during intake screening or after being confined are at the highest risk.

· Because most people considering suicide are ashamed of how they feel, they usually do not say, "I feel like killing myself. Please help me!"

· Only a small percentage (around 10%) of people who feel suicidal really want to die.

· People who have a history of suicide attempts are at higher risk for future attempts.

· The more attempts a person has made, the greater the likelihood that the person will eventually die from suicide. This is true even of inmates who made several attempts that seem to be attempts at manipulation of jail staff.

· Inmates who have harmed themselves on purpose should be considered higher suicide risks, even if their injuries are not potentially life threatening. This includes behavior such as wrist cutting.

Defendant Jeanne Reinart is a registered nurse. She has received training in mental health, including suicide assessments, and she has made mental health assessments in the course of her employment at the Monroe County jail, where she began working in August 2000. With respect to making mental health assessments, Reinart was taught to document the facts she observes without offering her own opinion.

In October 2002 or early November 2002, all Monroe County jail staff members received in-house training materials on mental illness and suicide prevention. (Neither side proposed facts about the content of these materials.)

The jail's policies and procedures in effect in 2002 included a section on suicide prevention. The policy includes the following provisions:

· Whenever available, suicidal inmates will be housed in the observation cell. If the observation cell is not available, a holding cell will be utilized with only a mattress, a pillow and uniform, in critical cases.

· An inmate who is classified suicidal who had medical/alcohol problems should be monitored in five (5) to fifteen (15) minute intervals, depending on the individual's condition.

· Jail staff must be aware of any information from health care providers and must exchange information we are aware of with said providers. This exchange of information is in reference to suicidal indications from inmates.

Any officer has the authority to commence a suicide watch, at least if he notifies the nurse first.

### C. *Previous Suicide Attempt at the Monroe County Jail*

In 2001, an inmate at the jail attempted suicide and was hospitalized. When the inmate returned several days letter, he was placed in the observation cell under 24–hour supervision. Defendant Schaldach was employed at the jail during this time a s a lieutenant and was informed of this problem.

### D. *Plaintiff's Background*

In 2002, plaintiff was a 42–year–old divorced mother of two daughters, ages 8 and 12. She was self-employed, cleaning homes and commercial establishments. Plaintiff and her daughters lived with plaintiff's fiancé, Kevin Wall.

Plaintiff was suffering from a great deal of stress. Her ex-husband was seeking a court order to obtain custody of her children. Both she and her fiancé suffered from health problems: he had a serious heart condition and she had degenerative bone disease in her right knee, which caused her pain daily. To combat her physical pain, plaintiff began taking medication and became addicted. In addition to these physical problems, plaintiff suffered from depression, for which she was taking medication.

### E. *Plaintiff's First Detention*

On September 18, 2002, plaintiff was taken to the Monroe County jail after her probation officer, Stan Roellich, placed her on probation hold. An unidentified staff member filled out a medical screening re-port after booking plaintiff, noting that she was taking Zoloft, a medication for depression. However, numerous questions that were supposed to be answered by staff were left unanswered on the report, including: "Does the inmate seem depressed or express helplessness or depression?" "Does the inmate appear agitated, anxious or upset?" Defendant Candace Warner, a nurse employed at the jail, reviewed the medical screening report without noting any deficiencies.

On September 20, plaintiff complained to defendant Reinart that she was experiencing withdrawal symptoms as a result of being deprived of Oxycontin, which she had been taking for her knee pain. On September 21, plaintiff made a request for anxiety medication.

On September 26, 2002, plaintiff was seen by defendant Reinart. In her notes, Reinart reported that plaintiff was "upset" and "tearful" as a result of being separated from her children. Plaintiff requested medication for anxiety attacks that made it difficult for her to sleep. A physician's assistant later prescribed Lorazepam.

During the same meeting with defendant Reinart, plaintiff complained to her that defendant Schaldach was taking another female inmate, Sherry Calhoun, to the conference room at night to have sex with her. Defendant Reinart reported plaintiff's accusation to both Mark Pressler (the jail administrator) and defendant Sheriff Amundsen, who told Reinart he would speak with plaintiff the next morning. Pressler independently informed Amundson of plaintiff's allegations on the same day. Amundson told Pressler, "This is what we have insurance for." Amundson did not speak to plaintiff or otherwise initiate an investigation. (I consider these facts to be undisputed even though defendant Amundson says in his deposition that

he "does not recall" whether these conversations took place). *Tinder v. Pinkerton Security*, 305 F.3d 728, 735–36 (7th Cir. 2002) (fact not genuinely disputed when party opposing it says only that she "does not recall" whether event happened).

On September 27, plaintiff prepared an inmate medical request in which she complained that the anxiety medication was not working. She wrote, "I can't deal with this anxiety another day." Defendant Fish received the request, which was forwarded to defendant Reinart. Reinart told plaintiff that she could not increase the dosage on her medication without approval of the physician assistant.

On September 30, 2002, plaintiff was released from the jail.

### F. *Plaintiff's Second Detention*

#### 1. *First attempt at self harm*

Plaintiff was detained again in the Monroe County jail on November 10, 2002, after she was arrested and charged with several crimes, including possession of drugs for which she did not have a prescription. Jail staff were aware of the problems plaintiff experienced during the previous detention, which included taking antidepressants, having anxiety attacks and experiencing distress over the separation from her children. The medical screening report, which was reviewed by defendant Reinart, again indicates that plaintiff was taking Zoloft.

When plaintiff first arrived, she was placed in the observation cell, which can be viewed from the "control center" through large glass windows or by closed-circuit video. The cell is connected to the control center by one of the main hallways in the jail. Anyone walking in that hallway can see through the metal bars of the door into the cell. On November 11, plaintiff was removed from this cell and placed in general population after returning from a court appearance. (Neither side proposed any facts explaining why plaintiff was placed in the observation cell or why she was removed the following day.)

Plaintiff was assigned to the south cell block, which houses a total of six female inmates. She was placed in a cell by herself, as are all inmates in that area of the jail. When doing cell checks, officers can see inside cells from a catwalk that the runs alongside the south block.

On November 12, plaintiff fell on the floor while she was in her cell, hitting her head. After other inmates notified staff, including defendants Reinart and Warner, plaintiff was taken to the hospital. She told hospital staff that her knee had "given out." She returned later the same day, with discharge instructions to be awakened every two hours and to be given an ice pack three times a day. Defendant Reinart communicated these instructions to other jail staff through the "pass on" log. ("Pass on" forms are used at the jail to communicate information from one shift to the next. Staff members are required to review these forms during their shift. The following defendants read them during every shift: Wildes, Wieman, Wegner, Janusheske, Fish and Schaldach.)

Upon her return, plaintiff requested a visit with Roellich, who gave his impression of the visit to officer Marilyn Stuart. In the shift log report, Stuart wrote the following: "PO Reilick [sic] stating that Mombourquette was sad and stating if she can not have her kids back what is the use of going on. Advised nurse [defendant Reinart] of her attitude and feeling sorry for herself. Will keep an eye on her."

After speaking to the detective investigating her criminal case, plaintiff told defendant Schaldach that she had nothing to live for and could not make it in jail another night without killing herself. He re-

corded this exchange in the shift log report. He took plaintiff to the conference room, sat next to her so that their knees were touching and asked her to squeeze his hands. When plaintiff asked him "what the hell was going on," he said, "This is better than hitting the wall."

Defendant Reinart spoke to plaintiff, after which plaintiff was placed in the observation cell. In the "staff to nurses" section of the November 12 "medical pass on" form, Reinart wrote of plaintiff: "in holding cell—very distraught—observe closely." However, plaintiff was not placed on a formal suicide watch at this time.

Plaintiff remained in the observation cell the following day. During the time plaintiff was in the cell, checks were conducted once or twice an hour, as often as every four minutes and as infrequently as every hour and thirty-six minutes. On the morning of November 13, defendant Reinart told defendant Janusheske, "We should keep an eye on" plaintiff. However, Reinart did not explain what this meant.

Nine hours later, in the late afternoon, plaintiff asked defendant Janita Leis, a corrections officer, to see a nurse. After Leis instructed her to fill out a nurse slip, plaintiff handed Leis a note that said simply "cut wrist." Plaintiff had used one of the lenses in her eyeglasses to (in the words of Leis) "slash" both of her wrists. Leis took the lens from plaintiff and sought help from defendants Wildes and Warner. Warner noticed that plaintiff had red marks and multiple abrasions on her neck, in addition to the three lacerations on each of her wrists, which had been bleeding. Warner documented her observations on the medical request form; Leis prepared an incident report, in which she classified the incident as a "suicide attempt." Wildes took plaintiff's comb and food tray from her.

As she cried, plaintiff told defendant Warner that she was afraid of losing her house, her children and a large contract for her cleaning business. During the same conversation, plaintiff said that defendant Schaldach had been taking another female inmate out of the cell at night to engage in sexual activity. She asked Warner whether "the other nurse" had reported anything. Warner responded, "If it doesn't directly involve me, I don't want to know about it." Plaintiff also told Warner about her interaction with Schaldach in the conference room the night before. Plaintiff told defendant Warner that Schaldach "is a pig."

Plaintiff was placed in "emergency detention" status under Chapter 51 of the Wisconsin Statutes. Defendant Leis prepared a statement, witnessed and signed by defendant Warner, that plaintiff "evidences behavior which constitutes a substantial probability of physical harm to self or to others." Defendant Wieman, a corrections officer, transported plaintiff to Gunderson Lutheran hospital. During the ride, plaintiff repeated her complaint to Wieman that defendant Schaldach was engaging in sexual activity with Calhoun. When Wieman returned, she told Schaldach about plaintiff's accusation.

On November 15, defendant Warner spoke with defendant Amundson about plaintiff's allegations about Schaldach. At the time, Amundson knew that Calhoun, the inmate with whom defendant Schaldach was having sexual contact, was under psychiatric care. Warner expressed her concerns that plaintiff would use the allegation as a "trump card ... to get what she wants" and that the allegations would "come out in [Calhoun's] therapy." Defendant Amundson never spoke to defendant Schaldach about plaintiff's allegations or otherwise initiated an investigation while plaintiff was detained at the jail.

## 2. *Second attempt of self harm*

At the hospital, a psychiatrist examined plaintiff. In his report, the psychiatrist summarizes plaintiff's complaint as "I slit my wrists and started on my throat and started banging my head against a brick wall." She repeated her fear of losing her children, her home and her business. The psychiatrist noted a number of concerns: drug addiction, claustrophobia, family members who are alcoholics, anxiety because of her detention, paranoia related to her ex-husband and feelings of depression for the previous six to eight months.

Plaintiff remained at the hospital for several days. On November 14, she attempted to hang herself with a bed sheet. She knotted the sheet around her neck, tied the other end to a door knob and slumped down on the floor. Staff discovered her and intervened before there were "significant consequences."

On November 18, the psychiatrist at the hospital released plaintiff from emergency detention status and discharged her from the hospital. Plaintiff's records from the hospital include the following observations from the psychiatrist:

(1) a diagnosis of opioid dependence, depressive disorder not otherwise specified, claustrophobia and antisocial personality disorder;

(2) a conclusion that "the main problem seems to be her suicidal ideation associated with the consequences of her sentence";

(3) a recommendation that plaintiff be kept on a suicide watch;

(4) a list of "discharge medications," including Zoloft (for depression, once in the morning); Ativan (for anxiety, every four hours if needed) and Ultram (for pain, four times a day).

The discharge instructions from the hospital state "suicide watch" multiple times.

The psychiatrist's name is written at the top of these instructions.

## 3. *Third attempt of self harm*

### a. November 18

When plaintiff returned to the jail from the hospital on November 18 at 2:21 p.m., she was placed in the south block in general population. No one conducted a mental health evaluation of her. Plaintiff met with her probation officer, who told officer Marilyn Stuart that plaintiff had tried to hang herself at that hospital, that he was concerned for plaintiff's safety and that staff should take away a pencil that plaintiff had. Stuart recorded in the first shift "pass on" log that plaintiff was "suicidal" and had tried to hang herself at the hospital. A similar note was repeated in the second shift "pass on" log.

At 3:30 p.m., plaintiff submitted a medical request to see a nurse about her medications. At 4:15 p.m., defendants Reinart and Wildes responded. Reinart called in plaintiff's prescriptions and noted that the lacerations on plaintiff's wrists were scabbed over. During the meeting, plaintiff told Reinart and Wildes what had happened at the hospital: "I hung myself in the bathroom with a sheet. I didn't really want to kill myself. The staff didn't check on me every 15 minutes." Reinart asked plaintiff to promise that she would not harm herself and plaintiff agreed. Plaintiff asked Reinart to tell her lawyer in a letter that she was concerned about her children, but Reinart told her she could not honor the request "due to legal issues."

Defendant Reinart reviewed the discharge instructions but she did not place plaintiff on suicide watch and she did not inform other jail staff that the discharge instructions included a suicide watch. It was standard procedure in the jail for the

nurse to provide discharge instructions to other jail staff.

Reinart did not place plaintiff in the observation cell, give specific instructions to staff relating to plaintiff or document the "contract" she had made with plaintiff. Generally, the determination whether to place an inmate at the jail in an observation cell after a hospitalization depends on the recommendation made in the discharge instructions.

Reinart wrote in the pass on log: "denies ideas of self harm or suicidal thoughts—continue to observe closely." Reinart did not explain what "observe closely" meant. She believed it was up to "the lead officer" to determine how to implement that instruction. Janusheske recalls seeing a note stating, "watch Brenda," which she interpreted to mean a suicide watch.

Dawn Cole, another inmate, thought plaintiff seemed upset. Cole observed that plaintiff was crying frequently. Plaintiff told Cole multiple times that she was going to commit suicide. Cole and other inmates began "beating on the door," telling staff that plaintiff belonged in the observation cell rather than general population. Cole told an officer named "Pat" that plaintiff should be put in the "birdcage," or the observation cell, which can be viewed by staff at all times. Plaintiff told other inmates in the south block that she was sad and worried about being in prison and losing her children.

After plaintiff returned, staff recorded cell checks of the south block (where plaintiff was housed) at 3:25 p.m., 3:53 p.m., 4:55 p.m., 4:57 p.m., 5:48 p.m., 6:25 p.m., 8:16 p.m., 8:47 p.m., 9:23 p.m., 9:26 p.m. and 11:29 p.m. Staff members performing these checks do not recall plaintiff exhibiting any behavior that would suggest she was a threat to harm herself.

Defendants Wegner, Wildes, Schaldach and Leis were on duty November 18.

b. November 19

Plaintiff requested an extra blanket from defendants Warner and Wegner, who denied the request. On the inmate medical request form, Warner wrote, "extra blanket [not] approved d/t suicide gestures." Warner called the hospital to confirm plaintiff's statement to defendant Reinart that plaintiff had tried to hang herself while in the hospital. In her notes for the call, Reinart wrote that hospital staff stated that they were "well aware of the incident."

The first shift daily pass on sheet states: "ALSO WE LEARNED MOMBOURQUETTE TRIED TO HANG HERSELF WHILE AT LAX. LUTHER?" Defendants Fish, Janusheske, Wieman, Wegner, Warner, Leis, and Wildes were on duty November 19, 2002. Each was aware that plaintiff had been placed in emergency detention for cutting her wrists, that plaintiff had tried to hang herself while she was in the hospital and that Warner had refused to give plaintiff an extra blanket because of "suicide gestures." Janusheske knew that plaintiff was taking medication for depression.

Plaintiff was not placed on suicide watch on November 19 and no special checks were performed. She remained in general population. Staff recorded 30 cell checks that included the south block, ranging from once every four minutes to once every hour and forty-seven minutes. Staff members performing these checks do not recall plaintiff exhibiting any behavior that would suggest she was a threat to harm herself.

c. November 20

Plaintiff met with her probation officer, who discussed with her a placement in a

130 day in-patient drug treatment program at Taycheedah Correctional Institution.

The daily pass on log repeats the notation from November 19 that plaintiff tried to hang herself while at the hospital. Because of plaintiff's history of drug abuse, defendant Warner added a note to the medical pass on that jail staff should perform hand and mouth checks after dispensing medication to plaintiff to insure that she was not stockpiling it.

Defendants Wieman, Janusheske, Wegner, Fish and Warner were on duty November 20.

Plaintiff was not placed on suicide watch on November 20 and no special checks were performed. She remained in general population. Staff recorded 23 cell checks that included the south block, ranging from every minute to every three hours and five minutes. Staff members performing these checks do not recall plaintiff exhibiting any behavior that would suggest she was a threat to harm herself.

d. November 21

At Roellich's request, defendant Reinart prepared a form called "Health Transfer Summary" relating to plaintiff. (Plaintiff's probation officer had asked Reinart to prepare the form in the hope that plaintiff could be transferred to another institution with drug treatment programs. The transfer request was unrelated to plaintiff's past attempts of harming herself.) Under "Precautions/Behavioral Information," Reinart marked the box for "Suicide Attempts/Threats." Reinart wrote that plaintiff had been hospitalized on November 13 for a "suicide attempt." Reinart met with plaintiff to discuss the transfer.

During the evening, defendant Schaldach approved a decision to place plaintiff in the conference room with colored pencils. Another inmate observed that plaintiff was "exhausted" and did not want to talk anymore.

The daily pass on log repeats the notation from November 19 that plaintiff tried to hang herself while at the hospital.

Defendants Leis, Janusheske, Reinart, Fish and Schaldach were on duty.

Plaintiff was not placed on suicide watch on November 21 and no special checks were performed. She remained in general population. Staff recorded 30 checks that included the south block, ranging from once every minute to once every hour and fifty-three minutes.

Staff members performing these checks do not recall plaintiff exhibiting any behavior that would suggest she was a threat to harm herself.

e. November 22

The daily pass on log repeats the notation from November 19 that plaintiff tried to hang herself while at the hospital. Plaintiff remained in general population on November 22. She was not placed on suicide watch and no special checks were performed.

Plaintiff met with her counselor, Kim Buchanan, around 1:30 p.m. Jail staff did not inform Buchanan about plaintiff's recent suicide attempts. Plaintiff voiced concerns to Buchanan about her children. She asked Buchanan whether she would be able to retain primary custody of them. In her notes, Buchanan stated that plaintiff "reports continued depression" and "responds impulsively."

Defendants Fish, Janusheske and Wildes were on duty at the time Buchanan had her meeting with plaintiff. None of them asked Buchanan about the meeting after it was over. Buchanan does not remember how long the meeting lasted, but her notes indicate that it finished at 2:30

p.m. Defendant Janusheske returned plaintiff to her cell after the meeting was over.

Staff recorded twenty three cell checks before 2:58 p.m.: 12:41 a.m., 1:22 a.m., 2:02 a.m., 2:33 a.m., 3:03 a.m., 3:36 a.m., 4:17 a.m., 4:59 a.m., 5:31 a.m., 5:59 a.m., 6:29 a.m., 6:31 a.m., 6:55 a.m., 8:21 a.m., 9:07 a.m., 9:08 a.m., 9:58 a.m., 11:20 a.m., 11:35 a.m., 11:55 a.m., 1:13 p.m., 1:17 p.m. and 2:36 p.m. Defendant Fish conducted the cell check of the south block that was documented in the log at 2:36 p.m. Fish does not remember whether plaintiff was in her cell during the cell check.

Defendant Janusheske recorded the following log entry at 2:57:57p.m.:

> Cell check in E/1, E/2, W/3, W/4, N/B. When I was walking in to [the south block], I saw [plaintiff] standing by the bars with a towel wrapped around her neck, called jail office, asked # 80 and # 8 to come back to [south block]. Nurse Jean assisting.

After defendant Janusheske discovered plaintiff hanging from the bars, defendants Wildes, Fish and Reinart responded to Janusheske's call for assistance. When Wildes arrived, he did not see defendant Janusheske. Instead, he saw another inmate trying to lift plaintiff to take the pressure off her neck. Reinart cut the bed sheet from around plaintiff's neck and lowered her on to the bunk. (Although defendant Janusheske's notes refer to the material as a "towel," it appears to be undisputed that it was actually a bed sheet.)

Defendant Reinart checked plaintiff's vital signs, finding no respiration and a very weak pulse. An ambulance was called while defendant Reinart began rescue breathing. Plaintiff was transported to the hospital at approximately 3:00 p.m.

As a result of the suicide attempt, plaintiff suffered from anoxic encephalopathy secondary to a lack of oxygen to the brain.

## OPINION

### I. MOTION IN LIMINE

Because it affects plaintiff's claims against multiple defendants, I consider first defendant Schaldach's motion to exclude evidence of his sexual activity with other inmates. Before permitting this evidence to be introduced, I must find that it is relevant, admissible and not unfairly prejudicial. In her brief opposing defendant Schaldach's motion in limine, plaintiff identifies three purposes of the evidence: (1) to show defendant Schaldach's motivation for failing to protect her; (2) to show that defendant Amundson was deliberately indifferent in failing to supervise defendant Schaldach; (3) to show that defendant Schaldach was sexually harassing plaintiff.

■ With respect to the third purpose, evidence that defendant Schaldach was sexually harassing plaintiff would certainly be highly relevant to the question whether he was deliberately indifferent to her health and safety. However, plaintiff does not explain how evidence that Schaldach was engaging in sexual activity with someone else is admissible to show he was sexually harassing plaintiff, particularly when there is little to no other evidence that Schaldach *was* harassing plaintiff. Using the evidence for that purpose would be marginally relevant at best and would certainly be unfairly prejudicial.

■ Nevertheless, defendant Schaldach's motion in limine must be denied with respect to evidence that plaintiff *reported* Schaldach's misconduct because such evidence shows that Schaldach had a strong motive to withhold protection from plaintiff and is thus relevant to show that

he intentionally disregarded a risk to plaintiff's safety. Although there is no evidence that Schaldach ever spoke to plaintiff about her complaint, the facts show that defendant Wieman told him about it. This is sufficient to establish Schaldach's intent. Although none of the defendants in this case acted to protect plaintiff, it is particularly puzzling why Schaldach, as the lead officer on November 18, failed to take any action once he learned that plaintiff tried to hang herself while she was at the hospital. Because plaintiff's accusation provides a possible motive for Schaldach's indifference, her reporting of it is relevant. Although I agree with defendant Schaldach that the evidence is likely to be prejudicial, I cannot conclude that it is unfairly so.

■ In addition, evidence that defendant Amundson refused to investigate plaintiff's allegations of sexual misconduct is relevant to show his state of mind. In *Woodward v. Correctional Medical Services*, 368 F.3d 917, 930 (7th Cir.2004), the court held in a jail suicide case that the defendants' refusal to correct or investigate staff misconduct that could affect the health and safety of inmates was relevant and admissible to show deliberate indifference, even when that misconduct was not related to suicide prevention directly. The court rejected arguments that such evidence was unfairly prejudicial or barred under Fed.R.Evid. 404. *Id.* Similarly, in this case, Amundson's dismissive attitude of a very serious complaint that could have a profound impact on the physical and psychological well-being of multiple inmates exhibits an attitude of deliberate indifference, both toward plaintiff's health and safety in particular and generally toward the health and safety of all the inmates at the jail. Although the relevance of this evidence is somewhat limited (this is not a case about sexual harassment after

all), defendant Schaldach has not shown that any unfair prejudice to him or defendant Amundson substantially outweighs the probative value of the evidence. Fed. R.Civ.P. 403. The motion in limine will be denied.

## II. MOTIONS FOR SUMMARY JUDGMENT

■ The Constitution guarantees persons in state or local custody a limited right to be protected from harm. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In determining whether this right has been violated, the standard is the same, regardless whether the person is a convicted prisoner or detainee, a victim of violence at her own hand or the hands of others. The question is whether the defendants were deliberately indifferent to a substantial risk of serious harm. *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir.2003). (The Supreme Court has noted, and the court of appeals has repeated on several occasions, that pretrial detainees are entitled to "at least" the same protection under the Fourteenth Amendment's due process clause as convicted prisoners are under the Eighth Amendment, suggesting that the standard of review could be different for pretrial detainees like plaintiff. *See, e.g., City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Henderson v. Sheahan*, 196 F.3d 839, 854 (7th Cir.1999); *Payne v. Churchich*, 161 F.3d 1030, 1040 (7th Cir.1998). Despite this observation, I am unaware of any case in which the Supreme Court or the court of appeals *has* applied a different standard of review in detainee cases. In any event, both sides assume that a "deliberate indifference" standard applies, so I will do the same.)

■ Not surprisingly, defendants do not argue that plaintiff's harm was insuffi-

ciently serious to trigger constitutional protections. Rather, as in other cases involving suicide or attempted suicide, the question is whether plaintiff has adduced sufficient evidence to allow a reasonable jury to find that each of the defendants was deliberately indifferent to plaintiff's health and safety. As is often repeated, the deliberate indifference standard requires more than a finding of negligence but less than a showing of intentional harm. *Gil v. Reed,* 381 F.3d 649, 664 (7th Cir.2004). The standard has two main parts. First, was the defendant subjectively aware of a substantial risk of serious harm to the plaintiff? *Farmer,* 511 U.S. at 828, 114 S.Ct. 1970. Second, if the defendant was aware of the risk, did he respond reasonably to the risk, even if the harm was not ultimately averted? *Id.* at 844, 114 S.Ct. 1970.

Of course, this test does not resolve all questions regarding the meaning of "deliberate indifference." For example, how great must a risk be before it is deemed "substantial" for the purpose of constitutional protections? The court of appeals has said only that it is more than "a mere possibility," *Pinkston v. Madry,* 440 F.3d 879, 889 (7th Cir.2006), but less than a certainty, *Collignon v. Milwaukee County,* 163 F.3d 982, 990 (7th Cir.1998). The Supreme Court has provided little guidance on this question and in fact expressly declined to consider it in *Farmer,* 511 U.S. at 834 n. 3, 114 S.Ct. 1970. In another Eighth Amendment case, the Court defined an "unreasonable risk" in part as one that society would not tolerate. *Helling v. McKinney,* 509 U.S. 25, 26, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). This suggests a meaning that is neither static nor rigid, but instead depends on the nature of the potential harm. In other words, the more serious a possible injury, the lower the threshold for showing that the risk is substantial. Cf. *In re Forty–Eight Insula-*

*tions, Inc.,* 115 F.3d 1294, 1300 (7th Cir. 1997) (adopting "sliding scale" approach to granting preliminary injunctions, in which requisite likelihood of success is contingent on balance of harms). For example, it is reasonable to expect officials to be more sensitive to a risk of death than to a risk of unsanitary conditions. "[W]e cannot equate death with dirty cells." *Wever v. Lincoln County, Nebraska,* 388 F.3d 601, 607–08 (8th Cir.2004) (holding that what constitutes adequate notice under deliberate indifference standard "must change depending on the seriousness of the incident").

With respect to the second part of the test, defendants suggest that they were not required to respond "reasonably" to known risks. They cite *Cavalieri,* 321 F.3d at 622, which includes the statement that, in a suicide case, the defendant "was not required to take perfect action or even reasonable action." But this statement is best interpreted as simply rejecting the proposition that the Constitution adopts a negligence standard, which imposes liability whenever a defendant fails to recognize a risk that a "reasonable" person would recognize. *Restatement (Second) of Torts* § 283 (1965). Any other reading would conflict with *Farmer,* in which the Court held explicitly that an official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable measures* to abate it." 511 U.S. at 847, 114 S.Ct. 1970 (emphasis added).

Generally, the court of appeals has reiterated the standard from *Farmer* that officials must take reasonable steps when they are aware of a substantial risk of harm. *Borello v. Allison,* 446 F.3d 742, 747 (7th Cir.2006); *Woodward,* 368 F.3d at 928; *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir.2002); *Sanville v. McCaughtry,* 266 F.3d 724, 737 (7th Cir.2001); *Estate of*

*Novack v. County of Wood,* 226 F.3d 525, 529 (7th Cir.2000); *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 258 (7th Cir. 1996). Accordingly, I conclude that the Constitution imposes a duty on government officials to respond reasonably to known risks of harm.

### A. *Defendant Reinart*

■ I begin with defendant Jeanne Reinart, who was the only defendant to review plaintiff's discharge instructions from the hospital and the first person plaintiff identifies who made a choice not to place plaintiff on suicide watch after she returned to the jail on November 18. (Although someone made the initial decision to place plaintiff in general population when she returned to the jail on November 18, neither side identifies who that was.) Defendants argue both that Reinart was not aware of a substantial risk of serious harm and that, even if she were aware of the risk, she responded adequately. (I refer to defendants collectively rather than to defendant Reinart alone because although Reinart filed her own brief in support of her motion for summary judgment, the other defendants make arguments in her defense and most of the arguments overlap Reinart's.)

### 1. *Awareness of risk*

Under *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970, a plaintiff must prove not only that the defendant knew facts that would *allow* the drawing of inference that the plaintiff was at a substantial risk of harm, but also that the defendant *actually* "dr[e]w the inference." Thus, no matter how apparent the risk would be to a reasonable person, a defendant may avoid liability if she was in fact ignorant. However, a defendant does not immunize herself from trial simply by averring that she was unaware of a risk. A plaintiff may use circumstantial evidence to persuade the finder of fact that the defendant was aware of the risk, despite her protestations to the contrary. Further, although a defendant is not liable for obvious risks of which she remained unaware, the obviousness of a risk may be used as evidence that the defendant was aware that danger was present. *Id.* at 842, 114 S.Ct. 1970. ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Viewing the evidence in the light most favorable to plaintiff, *Lopez v. City of Chicago,* 464 F.3d 711, 715 (7th Cir.2006), I conclude that a reasonable jury could find that defendant Reinart was aware of the risk that plaintiff would attempt to harm herself again. In reaching this conclusion, I find two facts to be the most striking: (1) plaintiff's two previous attempts to harm herself within the previous ten days; and (2) plaintiff's hospital discharge instructions that she should be placed on a suicide watch.

By themselves, plaintiff's two previous attempts of self harm would be sufficient to create a jury question. In all of the published appellate cases I have reviewed, the court found that, when the defendants were aware of recent suicide attempts, it would be improper to grant summary judgment or judgment as a matter of law on the question whether defendants were aware of a substantial risk of serious harm. *Woodward,* 368 F.3d at 924, 928; *Cavalieri,* 321 F.3d at 621–22; *Hall v. Ryan,* 957 F.2d 402, 405 (7th Cir.1992); *Perez v. Oakland County,* 466 F.3d 416 (6th Cir.2006) (Cudahy, J.) (suicide attempt one month earlier); *Snow ex rel. Snow v. City of Citronelle, AL,* 420 F.3d 1262, 1270 (11th Cir.2005) (inmate attempted to cut wrist one month earlier); *Turney v. Waterbury,* 375 F.3d 756, 760 (8th Cir.2004) (previous suicide attempt at another facility); *Colburn v. Upper Darby Township,* 838 F.2d

663, 669 (3d Cir.1988); *Cabrales v. County of Los Angeles,* 864 F.2d 1454 (9th Cir. 1988); *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182 (5th Cir.1986) (suicide attempt in previous confinement). *See also Bradich ex rel. Estate of Bradich v. City of Chicago,* 413 F.3d 688 (7th Cir. 2005) (concluding that defendants were not deliberately indifferent in failing to prevent suicide while noting that inmate had not tried to injure himself before); *Brown v. Harris,* 240 F.3d 383, 390 (4th Cir.2001) (defendant knew of suicide attempt week earlier; court assumed that defendant was aware of substantial risk but held that he acted reasonably by placing inmate on constant video monitoring); *Robey v. Chester County,* 946 F.Supp. 333, 337–38 (E.D.Pa. 1996). Although the court concluded that summary judgment was appropriate in *Matos ex rel. Matos v. O'Sullivan,* 335 F.3d 553, 554 (7th Cir.2003), the inmate in that case had attempted suicide three years before his incarceration and, more important, the defendants were unaware of it. The only specific sign that he was currently at risk was his saying that he was depressed over the recent death of his father.

When knowledge of plaintiff's suicide attempts is combined with instructions from the hospital to place plaintiff on suicide watch, it is clear that summary judgment is not appropriate with respect to this element. Although it is unnecessary to consider them, other facts suggest defendant Reinart was aware of a risk: (1) plaintiff was on medication for both depression and anxiety; (2) plaintiff had made multiple statements just days earlier that she was thinking of killing herself; (3) plaintiff had just returned from an emergency detention; (4) plaintiff had been upset since September about the prospect of losing her children, to the point that she could not sleep and anti-anxiety medications were not effective; and (5) plaintiff

continued to face all of the stressors that led to her previous acts of self harm: continued incarceration and possible loss of her children and business.

Despite defendant Reinart's awareness of these facts, defendants advance several arguments why they believe Reinart is entitled to summary judgment.

a. Medical judgment

Perhaps defendants' most vigorously asserted argument is that, despite defendant Reinart's knowledge of plaintiff's past acts of self harm, the discharge instructions and the other information Reinart knew about plaintiff, Reinart made a medical judgment that plaintiff would not attempt suicide. In other words, defendants argue that despite Reinart's awareness of these facts, she concluded that plaintiff did not have a "serious medical need" triggering a constitutional duty to act. *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1145 (1983) (analyzing failure to properly diagnose suicidal tendencies as question whether defendants were deliberately indifferent to serious medical need).

Defendants seek to take advantage of the court of appeals' holding that when "professionals such as physicians, psychiatrists, and nurses" make a decision "within their area of professional expertise," there can be no liability under the Constitution for failing to recognize a risk of suicide unless "the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment." *Collignon v. Milwaukee County,* 163 F.3d 982, 989 (7th Cir.1998) (citing *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). In other words, the court of appeals has held that unless there is evidence that the defendant did not use professional judgment,

it would be unreasonable for a jury to find that the defendant was aware of the risk.

Initially, there is a question whether defendant Reinart was qualified to make a determination that plaintiff was no longer at risk for harming herself. The cases on which defendants rely, *Collignon, Fromm* and *Sanville* involved decisions of *psychiatrists,* each of whom had conducted mental health examinations of the inmate. In fact, in *Fromm,* 94 F.3d at 263, the court concluded that a "risk classification is most appropriately made by a licensed psychiatrist" and that *"it would have been inappropriate* for any of the nurses to change [the psychiatrist's] classification for anything other than a temporary basis without consulting a physician." (Emphasis added). *See also* Perez, 466 F.3d at 425 (reasonable jury could find that caseworker was deliberately indifferent when she took inmate off suicide watch without consulting psychiatrist).

Further, to the extent that some nurses might be qualified to make assessments about suicide risks, defendant Reinart has not shown that she is one of them. She avers vaguely in her affidavit that she received instruction on this issue in nursing school, but she does not provide any evidence about what the instruction was or how she used it to assess plaintiff. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878, 887 (7th Cir. 1998). ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

Reinart avers that she had experience making mental health assessments while working for the Monroe County jail, but again she provides no specifics. In any event, Reinart was not hired at the jail until 2000 and the parties have proposed facts about only one other suicide attempt between 2000 and 2002. Reinart does not allege that she was involved in assessing that inmate.

Thus, defendant Reinart points to no evidence from which I could conclude that she was qualified to make a determination that an instruction for a suicide watch should be disregarded. In fact, as far as I can tell from this record, it appears that the *officers* received more training about suicide prevention than did defendant Reinart.

Even if I could conclude that Reinart was qualified, there is a genuine dispute whether defendant Reinart was actually using medical judgment. Unlike the doctors in *Collignon, Fromm* and *Sanville,* Reinart did not prepare a written report or otherwise document the medical basis for her decision to keep plaintiff in general population. Even more important, Reinart did not explain at the time why she chose to disregard the discharge instructions. The only documentation of her thought process was one line in the staff log stating: "[plaintiff] denies ideas of self harm or suicidal thoughts—continue to observe closely."

I disagree with defendants that Reinart's refusal to follow the discharge instructions is like the situation in *Fromm,* 94 F.3d at 261, in which the court held that no genuine dispute was created by an opposing opinion of the plaintiff's expert. This is not a case about a mere difference of opinion between two doctors. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996).

Rather, in this case, defendants had already "expressly noted" that plaintiff was at risk for harming herself when they hospitalized her. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970 (knowledge of risk may be inferred if risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). Defendant Reinart disregarded instructions from the very psychiatrist to whom plaintiff was sent in order to make a mental health assessment after she threatened to kill herself. That is not sound medical judgment.

Accordingly, I conclude that a reasonable jury could find that Reinart was aware that plaintiff was a suicide risk, either because the risk would be obvious, even to a layperson, *Collignon*, 163 F.3d at 989 ("a trier of fact can conclude that the professional knew of the need from evidence that the serious medical need was obvious"), or because any medical judgment she says she made was a substantial departure from professional judgment. *Cole*, 94 F.3d at 261–62 ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.")

b.  Discharge instructions

Defendants make two sets of arguments related to the discharge instructions. First, defendants say that the discharge instructions did not provide notice of a risk of harm because they were not signed by the psychiatrist and they did not provide details for implementing the suicide watch. (Defendants also point to statements made by the psychiatrist in other medical records, but none of the defendants can rely

on these because they did not see the records before November 22, 2002.) Defendant Reinart is free to make this argument to the jury, but it does not entitle her to summary judgment.

Again, the instructions came from the hospital that had been charged with assessing plaintiff's mental health. Although the psychiatrist did not sign the instructions, his name was listed at the top of sheet as the attending physician. It is undisputed that the general practice at the jail was to follow discharge instructions. Further, Reinart cannot argue plausibly that the words "suicide watch" have no meaning to her or that they do not connote an assessment that there is a substantial risk that plaintiff would attempt to harm herself. The jail's own policy outlines appropriate procedures for a suicide watch. Although it is certainly true that the instructions could be more detailed, a reasonable jury could find that defendant Reinart had at least enough notice to trigger a duty to investigate further by contacting the psychiatrist rather than simply failing to follow the instructions.

Second, defendants suggest that instructions for a suicide watch, no matter how clear, are never sufficient to provide a notice of a risk. Defendants cite *Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir.1998) and *Taylor v. Wausau Underwriters Insurance Co.*, 423 F.Supp.2d 882 (E.D.Wis.2006), for the proposition that "even if an inmate is on actual suicide watch, this does not demonstrate a substantial awareness of a substantial risk of imminent suicide." Defendants' reliance on these cases is misplaced.

First, with respect to *Collignon*, its facts are so inapposite that its instructiveness for this case is extremely limited. In *Collignon*, the decedent had killed himself after he was released from county custody; his family's claim was that the county was

liable for releasing him without an adequate treatment plan. In that context, the court considered the question whether the defendants' decision to place the decedent on suicide watch demonstrated that they were aware their treatment plan was inadequate to prevent the post-release suicide attempt. The court held only: "Placing him on a high level of suicide watch does not automatically impose on those responsible for the precaution a constitutional obligation to devise a treatment plan premised on the probability that Jonathan was on the verge of suicide." *Id.* at 990.

The facts of this case bear almost no relation to *Collignon.* Aside from the vastly disparate obligations the government owes to those in custody versus those out of custody, compare *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) with *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the most notable difference in this case is that, unlike the defendants in *Collignon,* defendant Reinart is not being called to task because she erred on the side of caution and placed plaintiff on suicide watch despite the lack of a clear need to do so. It is not Reinart's decision to place plaintiff in a particular status that shows her awareness of a risk, but her knowledge that the hospital from which plaintiff was just discharged believed that plaintiff *should* be placed on a suicide watch. If an official decides to place someone on closer observation as a matter of extreme caution or as a matter of routine (as defendants apparently did when plaintiff was initially detained), this does not necessarily communicate how great a risk the official perceived. *See also Taylor,* 423 F.Supp.2d at 893 (placement on suicide watch without more does not show awareness of risk when inmate was placed in that status primarily as matter of routine rather than because of risks specific to inmate). But

knowledge of a recommendation for a suicide watch issued by those to whom the inmate was sent to have a mental health assessment is certainly strong evidence that the official is subjectively aware of a risk of harm. Neither *Collignon* nor *Taylor* suggests otherwise.

Further, as noted above, the discharge instructions were not the only red flag for Reinart. They were simply a confirmation that the risk demonstrated by plaintiff's previous acts of self harm had not abated. Not surprisingly, defendants challenge the importance of those events as well.

c. Past acts of self harm

It is undisputed that defendant Reinart was aware that plaintiff cut her wrists on November 13, requiring her to be hospitalized, and that she attempted to hang herself with a bed sheet on November 14. Defendants make two related arguments in attempt to undermine the effect of the notice provided by these acts of self harm: (1) Reinart believed they were not "serious" suicide attempts; and (2) Reinart believed plaintiff was being "manipulative."

Throughout their proposed findings of fact and briefs, defendants object vigorously to any characterization of plaintiff's attempt to cut her wrists and neck on November 13 and to hang her herself on November 14 as "suicide attempts." This seems to be an implied concession that if defendants *had* perceived plaintiff's first two attempts of self harm as "suicide attempts," they would be unable to say they lacked awareness of a substantial risk of serious harm. These objections are disingenuous, however, because defendants, including defendant Reinart, consistently referred to the November 13 incident as a "suicide attempt" in their own records. In any event, defendants' game of semantics is unavailing. Regardless of the degree to

which plaintiff was physically harmed after her first two attempts, it is difficult to deny that cutting three lacerations on both wrists and hanging oneself with a bed sheet are distressing behaviors that signal the likelihood of another attempt, particularly when both attempts occurred within the previous few days.

A similar conclusion follows from defendants' "manipulation" objection. Defendants cite *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir.2004), for the proposition that a prison official "may be responsible without being credulous." This unremarkable statement provides no support to defendants. The question in *Riccardo* was whether the Eighth Amendment required prison officials to move a prisoner away from a cell mate he feared when the prisoner's word was the only evidence suggesting that he was in danger.

*Riccardo* is not instructive for at least two reasons. First, it was not plaintiff's unsubstantiated fears that triggered a constitutional duty to act in this case, but her demonstrated history of self harm. *Riccardo* would be on point only if the court had come to the same conclusion despite two past assaults by the same prisoner. Second, and more important, in a case such as this one, whether plaintiff was being "manipulative" is close to irrelevant. The important question is this: did plaintiff pose a serious risk of harm to herself? Defendants point to nothing in the record suggesting that Reinart believed a person who harms herself for "manipulative" reasons is less likely to make another attempt. Defendants' own training materials confirm what common sense would already suggest: "The more attempts a person has made, the greater the likelihood that the person will eventually die from suicide. *This is true even of inmates who made several attempts that seem to be attempts at* manipulation of jail staff." Aff. of Devanie, Exh. 63, dkt. # 116 (emphasis added). In this case, plaintiff had demonstrated that she was capable of hurting herself when she cut her wrists on November 13 and tried to hang herself with a sheet on November 14. It matters little why she did these things, that is, whether she actually wanted to kill herself or was just seeking to use these attempts to seek some secondary gain. If she did it twice before, she was likely to do it again.

### d. Plaintiff's denial of suicidal thoughts

Defendants' records indicate that plaintiff denied she was suicidal when she returned from the hospital. Defendants rely heavily on this, but I cannot conclude that this notation shows, as a matter of law, that Reinart did not believe plaintiff to be in danger of harming herself again. The Supreme Court has held explicitly that knowledge of a risk of harm need not come from the plaintiff herself. In *Farmer*, 511 U.S. at 848, 114 S.Ct. 1970, the Court held that it would be error to absolve officials of liability simply because statements from the plaintiff did not indicate that she was in danger. In this case, there was questionable value in plaintiff's self reporting of her mental state when she was under severe stress, on multiple psychotropic medications and recovering from a drug addiction, suffering multiple mental health conditions and returning from an involuntary commitment to a hospital.

It is true that there is case law in which the court of appeals has absolved prison officials of liability while noting a prisoner's statement to those officials that he did consider himself to be suicidal, *Collins v. Seeman*, 462 F.3d 757, 759 (7th Cir.2006); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir.2000), but these cases are readily distinguishable.

644

In *Collins,* 462 F.3d at 759, the *only* factor initially suggesting that the inmate was at risk was a statement from the inmate that he was "feeling suicidal." Thus, when the inmate told the defendant officer that "he was all right and could wait until the counselor arrived," the court held that liability could not be imposed simply because the officer left the inmate alone for fifteen minutes at a time. *Id.* Both *Collins* and *Novack* were missing two key facts present in this case: previous attempts of self harm and instructions from a psychiatrist to place the inmate on suicide watch.

In cases in which the inmate had already demonstrated a tendency to harm herself, courts have held uniformly that a genuine dispute remains whether the defendants were aware of substantial risk of serious harm, even when the inmate denies feelings of suicide. *Perez,* 466 F.3d at 416 (summary judgment not appropriate despite inmate's denial of suicidal ideations; inmate had attempted suicide one month earlier); *Cavalieri,* 321 F.3d at 619–20 (inmate's statement that he was "doing fine" not dispositive when inmate had made earlier statements that he was going to kill himself and had made previous attempt to kill himself); *Robey v. Chester County,* 946 F.Supp. 333, 337–38 (E.D.Pa.1996) (denial of suicidal intentions not dispositive when inmate had been diagnosed with major depression and had attempted suicide in the past). *See also Wever,* 388 F.3d at 604–05 (jury question on deliberate indifference remained despite inmate's promise not to commit suicide when inmate had recently threatened suicide).

e. Opinions of other experts

Defendant Reinart points to the testimony of Kim Buchanan, plaintiff's counselor, who says she did not consider plaintiff to be suicidal when she met with her. However, any reliance on Buchanan's opinion now is misplaced because it is undisputed that no one at the jail ever spoke with Buchanan about her assessment of plaintiff. Defendants do not suggest that Reinart did or did not do anything because of Buchanan. Defendants also point to the opinions of their two experts, Kenneth Robbins, a psychiatrist, and Daniel Kennedy, a professor of criminal justice. (Of course, plaintiff points to contrary opinions of her own experts, but I need not consider these to decide defendants' motions for summary judgment.) Even if I assume that both of these experts are qualified to give an opinion in this case, I cannot conclude that their opinions are dispositive. Although the court of appeals occasionally has noted the opinions of experts in cases involving the failure to prevent a suicide attempt, the court has not discussed the weight that should be placed on them in the context of a motion for summary judgment. *Matos ex rel. Matos v. O'Sullivan,* 335 F.3d 553, 557–58 (7th Cir.2003) (rejecting expert's opinion on obviousness of risk). In deciding whether summary judgment is appropriate in one of these cases, the court has never considered an expert's opinion to be decisive.

Regardless of the potential value of an expert's opinion in a case such as this one, the opinions cited by defendants in their proposed findings of fact provide little assistance in resolving this case. Both opinions are simply bald conclusions that defendants did not act with deliberate indifference to plaintiff. A conclusion without a factual basis is not helpful to the finder of fact, meaning that these opinions flunk the test for expert testimony under Fed.R.Evid. 702. *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

f. Lack of suicidal indicators from November 18 to November 22

Finally, defendants argue that even if defendant Reinart was aware of a substantial risk of harm on November 18, this was no longer the case by the time plaintiff hung herself four days later because Reinart did not observe any suspicious behavior from November 18 to November 22. For support, defendants cite a statement in *Collins*, 462 F.3d at 761, that the "defendant must be cognizant of the significant likelihood that an inmate may *imminently* seek to take his own life." (Emphasis added).

This argument goes nowhere for a number of reasons, most obviously because it is undisputed that defendant Reinart was not doing much observing of plaintiff from November 18 until her attempted suicide on November 22. Although defendants say in their proposed findings of fact that Reinart "continued to monitor [plaintiff's] condition after November 18," DPFOF ¶ 239, dkt. # 51, this again is not a specific fact on which defendants can rely in support of their motion for summary judgment. *Drake*, 134 F.3d at 887. The only contact between plaintiff and defendant Reinart between November 18 and 22 of which there is any evidence is a meeting made on the request of plaintiff's probation officer and unrelated to an assessment of plaintiff's mental health.

Moreover, there is evidence that, if defendant Reinart had looked a little closer, she would have realized that all was not well. Other women in cells near plaintiff testified that plaintiff seemed to be very depressed after she returned from the hospital: she was still worried about losing her children, continued to cry and stated that she still wanted to kill herself. Although defendants dispute some of the testimony of these inmates, I may not disregard plaintiff's evidence simply because it is unsupported by defendants' records.

As the Supreme Court explained in *Farmer*, 511 U.S. at 843, 114 S.Ct. 1970, a defendant may "not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." In other words, the Constitution does not reward those who play ostrich. *See also McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir.1991)("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent.")

Without probing plaintiff's mental health status, defendant Reinart had no reason to believe that the risk of danger had abated between November 18 and November 22. Plaintiff was still experiencing all of the stressors that had led to her first two acts of self harm: continued incarceration, potential loss of her children and business. Even if Reinart had been monitoring plaintiff closely without observing any warning signs, I could not conclude that a time lapse of four days without a suicide attempt suggests that plaintiff was no longer at risk. *Cf. Soles v. Ingham County*, 316 F.Supp.2d 536, 542 (W.D.Mich.2004) (no deliberate indifference when defendants took inmate off suicide watch after more than one month while monitoring inmate's response to anti-depressant medication). A reasonable jury could find that defendant Reinart was aware that there was a substantial risk that plaintiff would attempt to harm herself on November 22.

2. *Reasonable response*

I likewise conclude that a reasonable jury could find that defendant Reinart did not respond reasonably to the risk. It is undisputed that Reinart took virtually no action to protect plaintiff after she re-

turned from the hospital. She failed to place plaintiff on a suicide watch, even though that was part of plaintiff's discharge instructions. She withheld the discharge instructions from other staff, even though this was contrary to both her own general practice and to jail policy, which required her to disseminate to other jail staff all information provided by health care providers. She did not order follow up care for plaintiff, consult with the hospital that discharged plaintiff regarding proper care or place plaintiff in the observation cell (which was also required by jail policy). She did not order more frequent cell checks on plaintiff or monitor plaintiff herself, even though plaintiff told Reinart that lack of monitoring contributed to one of her previous attempts of self harm. Reinart provided no specific instructions to other jail staff on special precautions to take. Finally, there is a dispute whether Reinart ignored medical requests that plaintiff made to her during this time period.

Most relevant to the events on November 22, defendant Reinart did not take away from plaintiff any objects she could use to hurt herself, including bed sheets, the very materials with which plaintiff had hung herself only a few days earlier. This is a common jail practice, noted in numerous cases considering whether a prison official responded reasonably to a risk of harm. *Cavalieri*, 321 F.3d at 621 ("prisons and jails have developed procedures for dealing with prisoners who display suicidal tendencies, such as removing items that could be used as a suicide weapon, like sheets or a sturdy telephone cord"); *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir.2003) (noting that "cell had been stripped of implements that might assist suicide"); *Frake v. City of Chicago*, 210 F.3d 779, 780–81 (7th Cir.2000) ("If it seems likely that a person is suicidal, other precautions are taken, such as placing the person in a cell which can be continuously observed and replacing the person's clothing with a paper suit."). It does not take an expert in mental health to realize that a person should not be left alone for any period of time with materials with which she had tried to kill herself only a few days earlier. *Coleman v. Parkman*, 349 F.3d 534, 540 (8th Cir.2003) (noting testimony of jailer that placing suicidal inmate in cell without bed sheet "would come under the common sense rule"). Common sense is confirmed by the Monroe County jail's own policy, which states that dangerous objects should be taken from inmates who are at risk of harming themselves.

Defendant Reinart points to several actions that she identifies as reasonable responses, including the "observe closely" notation she put in the log and the promise she elicited from plaintiff to refrain from harming herself. I cannot conclude that these actions, either separately or together, are sufficient to show as a matter of law that Reinart responded reasonably. With respect to the log notation, Reinart did not explain to staff what she meant by "observe closely" and, as noted above, there is no indication that she did anything to confirm that plaintiff was being carefully monitored. With respect to plaintiff's promise, Reinart had ample reason not to rely on the verbal assurances on someone who has just attempted multiple acts of self harm. Reinart cites no authority holding that seeking such an assurance relieves the defendant of any further obligation. *Wever*, 388 F.3d at 604–05 (reasonable jury could find defendant deliberately indifferent when he gave blanket to prisoner shortly after inmate threatened suicide, despite inmate's promise not to harm himself).

The Constitution does not hold officials liable only when they do *nothing*. *Cavalieri*, 321 F.3d at 622 (jury could find that

defendant failed to respond reasonably even though he spoke with inmate to "check on his welfare" and offered to help arrange for plaintiff to see counselor). The question is not whether defendants took any action at all, but whether, knowing what they did, they made a *reasonable* response. *Comstock v. McCrary*, 273 F.3d 693, 708 (6th Cir.2001) (inadequate response "to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment"). Given defendant Reinart's failure to take away dangerous objects from plaintiff in combination with her failure to take many other measures, I cannot conclude that summary judgment is appropriate. *Cavalieri*, 321 F.3d at 621 (affirming denial of summary judgment when defendants placed known suicidal inmate in holding cell with telephone cord he used to hang himself); *Coleman*, 349 F.3d at 539 ("The jury could reasonably deduce that appellants recklessly disregarded that risk when they issued Coleman a bed sheet and placed him in a cell where they could not easily observe him."); *Robey*, 946 F.Supp. at 337–38 (reasonable jury could find deliberate indifference when defendant took inmate off suicide watch despite recent suicide attempts).

### B. *Defendants Warner, Schaldach, Wegner, Janusheske, Wildes, Leis, Weiman and Fish*

#### 1. *Awareness of risk*

■ The primary difference between defendant Reinart and these defendants is that they were not aware of the discharge instructions from the hospital because Reinart failed to communicate them to the rest of the jail staff. It is thus a closer question whether a reasonable jury could find that these defendants were aware of a substantial risk of serious harm. I conclude nevertheless that a reasonable jury could much such a finding, primarily because each of these defendants was aware by November 22, either through personal observation or by reading the staff logs, that plaintiff had been hospitalized for a suicide attempt only a few days earlier and had tried to hang herself while at the hospital. As noted above, courts have held consistently that knowledge of a recent suicide attempt creates at least a question for the jury whether the defendants were substantially aware of a risk. *E.g., Turney v. Waterbury*, 375 F.3d 756, 760 (8th Cir.2004). Further, nearly all the defendants received training that inmates who have made previous suicide attempts are the highest risk for further attempts of self harm. *Woodward*, 368 F.3d at 921–22 (relying on training policies in affirming jury decision that defendants were deliberately indifferent to substantial risk of suicide). Each defendant was aware also that plaintiff had been making threats to kill herself only a few days earlier.

Most of the arguments defendants raise on this question I have considered in the context of the claim against defendant Reinart and it is unnecessary to cover the same ground again. However, I will address the several arguments that do not overlap.

Defendants' primary argument is that they "were absolutely entitled to rely on th[e] professional judgments" of Reinart and Buchanan. Dfts.' Br., dkt. # 50, at 23. They cite *Davis v. Jones*, 936 F.2d 971 (7th Cir.1991), for the proposition that determinations whether a medical condition is serious are best left to medical professionals. *Davis* does not support defendants' position. To the extent defendants mean to argue that only medical staff may be liable for failing to prevent an inmate's suicide, this position is untenable, as demonstrated by the numerous cases cited throughout this opinion in which courts have found

correctional officers to be potentially liable. In fact, in *Sanville*, 266 F.3d 724, the court concluded that the defendant psychiatrists were not deliberately indifferent, but that a reasonable jury could find that the correctional officers were. *Davis* actually cuts against the defendants' argument because the court held in that case that police officers are constitutionally required "to seek medical attention for medical care when the wound reasonably *appears* to be serious even if the risk turns out to have been small." 936 F.2d at 972 (emphasis added).

Of course, jail employees are entitled generally to rely on the opinions of those who are more knowledgeable than themselves. But, as noted above, it appears that the nonmedical jail staff had at least as much training on suicide prevention as did defendant Reinart, if not more.

In any event, defendants point to no evidence that they did in fact rely on anything Reinart said or did. First, with respect to the decision Reinart made, it is not as if she instructed staff, "I do not consider Brenda Mombourquette to be a suicide risk. No special precautions are necessary." Reinart wrote only that plaintiff had denied feeling suicidal and that staff should "observe" plaintiff "closely," without explaining what this meant. Although Reinart's instructions are not clear, they provide defendants no basis to say they believed plaintiff was in no need of special care. Further, defendants mischaracterize the record in their brief when they say they knew that Reinart was "trusted to make suicide assessments." The proposed finding of fact cited shows only that the *jail administrator* (who is not a defendant) believed that Reinart was qualified to make mental health assessments. Dfts.' PFOF ¶ 135, dkt. # 51. Defendants cite no evidence that they relied on Reinart's judgment in this or any

other case, or even that they viewed her as competent to make judgments about suicide. *Sanville*, 266 F.3d at 739 (correctional officers may not rely on psychiatrist's determination when no evidence indicated that "any of the doctors actually determined that [inmate] was not suicidal, much less that they then informed the guards that [inmate] was not suicidal and that the guards then decided not to act based on that information").

As defendants themselves assert repeatedly throughout their briefs and proposed findings of fact, no one staff member was assigned the duty of determining whether an inmate posed a threat to herself. Rather, all staff members had this responsibility collectively and any one of them had the authority to initiate a suicide watch. In their reply brief, defendants assert that they were not aware of a risk because "it was an open question as to whether Mombourquette had genuinely attempted to take her life in the hospital." Dfts.' Br. dkt. # 142, at 5. For support, defendants point to the question mark that followed the entry in the staff log stating "ALSO WE LEARNED MOMBOURQUETTE TRIED TO HANG HERSELF WHILE AT [the hospital]?" Defendants are grasping at straws; an awareness of a risk is not contingent on the punctuation used. Again, defendants did not have to be absolutely certain that plaintiff was in danger before they were required to act. Even if the notation left some room for doubt, defendants may not avoid liability if they refused to investigate facts that they strongly suspected to be true. *Farmer*, 511 U.S. at 843, 114 S.Ct. 1970.

### 2. *Reasonable response*

Like defendant Reinart, the other defendants did almost nothing to protect plaintiff from harming herself again after she returned to the jail on November 18.

Even after learning that plaintiff had hung herself at the hospital, they did not place her on suicide watch, put her in the observation cell or take away potential harmful objects. They did not seek further direction from defendant Amundson or from plaintiff's counselor when she visited the jail. Further, defendants proposed no facts showing that they carried out Reinart's instruction to observe plaintiff closely. Although the instruction was vague, defendants did not seek to clarify it or interpret it for themselves. It does not appear that any of defendants asked plaintiff even once whether she was feeling suicidal or depressed. With two minor exceptions by defendant Warner, defendants point to no evidence that they took any special precautions or treated plaintiff any differently from any other inmate. A reasonable jury could find that defendants should have learned both from their training and from plaintiff's earlier attempts that they could not simply wait for a fatal event to occur before taking action. *Helling*, 509 U.S. at 33, 113 S.Ct. 2475.

Defendant Warner did refuse to give plaintiff an extra blanket, but this hurts more than helps Warner's case. In refusing to give plaintiff the blanket because of her "suicidal gestures," defendant Warner suggests strongly that she was aware both of the likelihood that plaintiff would harm herself again and that bedding was one of the materials she could use to do it. Although it certainly made sense to deny plaintiff an object she could use to hurt herself, if plaintiff could hang herself with a blanket, would it not be obvious that she could do the same with a bed sheet?

Warner also instructed to staff to make sure plaintiff was not stockpiling medication, but Warner admits that she made this decision because plaintiff had a history of drug abuse, not because she was trying to prevent plaintiff using medication to

commit suicide. In any event, I cannot conclude as a matter of law that taking steps to prevent one method of self harm is sufficient to resolve a defendant of liability, particularly when plaintiff had used two other methods to hurt herself in the past.

Defendants also point to the cell checks they did between November 18 and November 22, emphasizing that they checked on plaintiff only minutes before she hung herself. (The parties dispute the length of time plaintiff was alone before she was discovered. Defendants say it was less than five minutes; plaintiff says that it is unknown how long it was, but it was much longer than five minutes.) Even if I assume that plaintiff was left unsupervised for less than five minutes, this would not require that defendants' motion for summary judgment be granted. It is undisputed that the short span of time between the last two checks on plaintiff was completely fortuitous. Defendants were not checking plaintiff consistently every five minutes, fifteen minutes or even every hour. According to defendants' own records, plaintiff was left unsupervised for intervals of more than three hours. (And it could have been even longer. Plaintiff raised a legitimate question about the accuracy of defendants' records of cell checks. The jail administrator from 2002 testified that jail staff commonly recorded cell checks that were never actually conducted.)

Plaintiff argues that if defendants had checked on her more often or more carefully, they might have seen more signs that she was still feeling suicidal. Although defendants object to this argument as speculation, plaintiff cites testimony of other inmates housed near plaintiff that, even after November 18, plaintiff continued to be depressed and to talk about committing suicide. This testimony at

least creates a genuine dispute whether the cell checks were a reasonable response. *Snow*, 420 F.3d at 1270 (although defendants checked inmate fewer than fifteen minutes before she committed suicide, reasonable jury could find that "more vigilant" observation would have prevented suicide).

Finally, defendants point to no authority suggesting that conducting frequent cell checks is sufficient as a matter of law when the inmate is nevertheless left unsupervised with the same materials she used to hang herself only days earlier. *Id.* (despite cell check fewer than fifteen minutes before suicide attempt, jury could find inmate would not have committed suicide if "items she could have used to harm herself [were] removed from her reach").

It is true that defendants did not evince a complete lack of concern for plaintiff. Defendants propose various facts about things they did for plaintiff, such as allowing her to talk to her children and making sure she received her medication. But these random acts of kindness have little relevance in determining whether defendants acted reasonably to prevent plaintiff from attempting suicide. An official who shows concern for an inmate by feeding him every day may still be held liable for denying him water; a doctor who examines a prisoner whenever requested may still be liable if he withholds necessary treatment. *Cavalieri*, 321 F.3d at 622, 625 (rejecting argument made by dissenting judge that defendant's "time, attention and concern" to inmate required a conclusion that defendant acted reasonably).

To prevail, it is not necessary for plaintiff to show that defendants were monsters or had no concern for her well being. The standard of deliberate indifference does not require a showing of malicious intent or ill will toward plaintiff. *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970 ("the cases are also clear that [the test for deliberate indifference] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). Plaintiff has to show only that defendants knew of the risk and did not act reasonably to abate it. She has adduced sufficient evidence to allow a reasonable jury to make that conclusion.

### D. *Defendant Amundson*

██ There are two ways that a government actor may be sued: in his official capacity or his individual (sometimes called "personal") capacity. Generally, an official capacity suit is a brought against a high-ranking official as a way of challenging an unconstitutional policy, practice or custom. *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir.1991). Suing a government employee in his official capacity is akin to suing the entity that employs him and the standard for liability is the same. *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In contrast, an individual capacity suit requires a showing a personal involvement. Although the test for personal involvement has been stated in different ways, a commonly cited understanding is set forth in *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995):

> An official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

(Internal quotation marks and citations omitted).

Plaintiff does not state unambiguously that she is suing defendant Amundson in his individual or official capacity but rather that she is suing him "individually in his supervisory capacity." Plaintiff's lack of clarity is not entirely her fault. Courts have struggled with limited success in defining the contours of the liability of supervisors in § 1983 cases. The confusion began with *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), a case preceding *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in which the Supreme Court considered the liability of a mayor and police commissioner under § 1983. Without discussing whether its analysis applied to individual or official capacity suits, the court concluded that there could be no liability because there "was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners." *Id.* at 371, 96 S.Ct. 598. To this day, commentators continue to question whether *Rizzo* was about individual or official liability 1A Martin A. Schwartz, *Section 1983 Litigation*, § 7.19[C] (4th ed.2006).

Since *Rizzo*, the Court has not revisited the question of supervisory liability under § 1983, leaving the various courts of appeal to establish their own divergent tests, often choosing with little or no explanation some amalgamation of the standards for individual and official (or municipal) liability. *E.g., Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996) (knowledge of violation not required but only "that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation"); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (liability may be imposed on supervisor if he (1) participated directly in violation; (2) was aware of violation and failed to remedy it; (3) was responsible for a policy that caused the violation; and (4) was grossly negligent in supervising subordinates who committed violation); *Baker v. Monroe Township*, 50 F.3d 1186, 1194 (3d Cir.1995) (supervisor must have "actual knowledge and acquiescence" in constitutional violation); *Greason v. Kemp*, 891 F.2d 829, 836–37 (11th Cir.1990) (relying on standard for municipal liability and concluding that supervisors could be liable if they were deliberately indifferent in supervising subordinates).

In this circuit, the court of appeals has stated that the test for imposing liability on supervisors is the same as that for any other individual: whether the "conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent." *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir.2005). "[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988) (citations omitted).

Nevertheless, the court of appeals has held that liability is appropriate even if the supervisor was not aware of the particular constitutional violation at issue. For example, in *Kitzman–Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir.2000), the court recognized that a supervisor's personal liability could be predicated on "the failure to train adequately the government agent who is alleged to have committed the constitutional violation," citing the standard for municipal liability. And in *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002), the court again mirrored the standard for official or municipal liability suits in stating that a supervisor could be held personally liable if he was responsible for a policy, practice or custom that caused the constitutional violation. Accordingly, I conclude, as the parties appear to agree, that plain-

tiff may prove her claim against defendant Amundson so long as she establishes that there is an "affirmative link between the action complained about and the official sued," *Gentry*, 65 F.3d at 561, and she can otherwise satisfy the standard for deliberate indifference. *Farmer*, 511 U.S. at 843–44, 114 S.Ct. 1970 (to establish deliberate indifference plaintiff need not show that defendant was aware of risk specific to plaintiff if "all prisoners in his situation face such a risk").

Plaintiff seeks to hold defendant Amundson liable both because his policies were severely inadequate and because he was deliberately indifferent to the consequences of his failing to properly train and supervise the other defendants. I have little difficulty in concluding that a reasonable jury could find that there is an "affirmative link" between Amundson's failings and the failure to prevent plaintiff from attempting to commit suicide. At least two related problems with the general operation of the jail contributed to defendants' failure to stop plaintiff's attempted suicide: (1) the lack of a clear delineation of authority with respect to assessing risks of suicide; and (2) inadequate means of staff communication.

It seems that no one at the jail wanted to take responsibility for dealing with plaintiff once she returned from the hospital. This began from the moment she reentered the jail. Despite defendants' knowledge that plaintiff had been hospitalized for a suicide attempt, they did not assess her mental health status or deliberate about her proper classification. Instead, defendants simply returned plaintiff without discussion to the south block in general population. It was not until plaintiff made a medical request that jail staff met with her.

Each of the defendants appears to believe that someone else should have taken charge. The officers argue in their briefs that defendant Reinart should have been responsible for determining whether plaintiff was a suicide risk. In her deposition, Reinart testified that "the lead officer" (presumably defendant Schaldach) should have determined what to do with plaintiff. In his deposition, defendant Schaldach testified that he *did not know* why plaintiff was not placed in observation, even though he was the shift supervisor on November 18. The likely reason that each party denies responsibility is that the jail's policy does not squarely place responsibility on *anyone*. Again, all jail staff are equally responsible under the policy, which not surprisingly means that all staff attempt to fix the blame on someone else. Closely related, effective communication was also sorely lacking at the jail. Although many events were documented in various logs, there was no mechanism in place for determining what should be done about issues that were raised in these logs. This problem was demonstrated time and time again in plaintiff's case, most obviously when no one took action despite repeated statements in the logs that plaintiff had tried to hang herself while at the hospital. A reasonable jury could find that plaintiff's attempted suicide could have been prevented if defendant Amundson had in place a policy that more clearly delegated authority and established procedures for acting on information documented in the logs. In other words, the jury could find that "but for" defendant's Amundson's failures, the remaining defendants "would have taken reasonable steps to prevent [plaintiff] from [attempting to] tak[e][her] own life." *Novack*, 226 F.3d at 532.

This is not enough, however. Plaintiff must show also that defendant Amundson's policies and practices (or lack of them) "towards the treatment of its mentally ill inmates [were] so inadequate that

[he] was on notice at the time that [plaintiff] was incarcerated that there was a substantial risk that [s]he would be deprived of necessary care in violation of [her] [Fourteenth] Amendment rights." *Woodward,* 368 F.3d at 927.

A reasonable jury could find that defendant Amundson had such notice. First, courts have concluded that deliberate indifference to a risk of suicide may be established solely by knowledge that the defendant failed to properly delegate responsibility for suicide assessments. *E.g., Estate of Cills v. Kaftan,* 105 F.Supp.2d 391, 402–03 (D.N.J.2000) (failure to have suicide assessments conducted by someone with psychiatric training); *Estate of Abdollahi v. County of Sacramento,* 405 F.Supp.2d 1194 (E.D.Cal.2005) (failure to train employees in communicating suicide risks to mental health personnel). *See also Rhyne v. Henderson County,* 973 F.2d 386, 395–96 (5th Cir.1992) (Goldberg, J., concurring) ("vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees").

Further, as plaintiff points out, defendant Amunson's failure to designate responsibility for handling inmates who are potential suicide risks is a violation of state law. Wis. Admin. Code § DOC 350.19(2) (requiring "[d]esignation of person who may assess an inmate's level of suicide risk and who may authorize placement on and removal from a suicide watch status for inmates who are suicide risks") Although this is not dispositive, it is relevant evidence. *Boncher,* 272 F.3d at 487–88. *See also Robey,* 946 F.Supp. at 338 (denying summary judgment in jail suicide case against county because defendant failed to comply with "minimal practice in the field").

Defendant Amundson had notice not just from the law but also from those who were charged with evaluating his performance. Both Scott Morris, the jail inspector for the Wisconsin Department of Corrections, and Mark Pressler, the jail administrator, severely criticized Amundson's operation of the jail on issues that are highly relevant to this case. The jail inspector identified problems in 2002, such as failing to properly classify and house suicidal inmates (in violation of state law), failing to insure effective staff communication during crisis situations and failing to properly supervise and train officers such as defendant Schaldach, who was running the jail on a day-to-day basis. His general opinion was that the jail was "poorly run" and "poorly supervised."

Pressler's assessment of the jail under defendant Amundson's supervision paints an even starker picture. He reported problems to Amundson about staff failures to perform cell checks for up to six hours, threats by staff and staff sexual misconduct, among other things. Amundson did not investigate any of these problems. Pressler's overall view was that Amundson provided no supervision of the prison and failed to hold staff accountable for their actions. As noted in the context of defendant's motion in limine, evidence of defendant Amundson's general lack of concern about staff misconduct and the safety and health of inmates is relevant to show that he was deliberately indifferent toward plaintiff. *Woodward,* 368 F.3d at 922 (testimony that environment at jail was "very lax, unprofessional" and that supervisors disregarded complaints about staff misconduct toward inmates was relevant to show deliberate indifference).

If the jury believes plaintiff's assessment of the jail under defendant Amundson's tenure, with staff essentially running amok without any supervision from

Amundson, it could find reasonably that he was deliberately indifferent to a risk that an inmate like plaintiff would seriously harm herself.

### E. Children's Claims

Plaintiff's two children, E.S. and C. S., both of whom are minors, seek damages for the loss of society and companionship of their mother. Defendants argue that these claims are barred under circuit precedent because children may not recover for loss of society and companionship under § 1983 unless the defendants "intentionally interfered" with the parent-child relationship. However, defendants' argument relies solely on *Russ v. Watts,* 414 F.3d 783, 790 (7th Cir.2005), which, as plaintiff points out, is limited to adult children. The court expressly declined to consider the scope of minor children's ability to recover, stating that their "need for the guidance and support of their parents warrants sharply different constitutional treatment." *Id.* (Internal quotations omitted). Accordingly, I conclude that defendants have failed to meet their initial burden under Fed.R.Civ.P. 56 to show that they are entitled to summary judgment on these claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 328, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (White, J., concurring) ("It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.") If defendants have additional legal support for dismissing the minor children's claims, they may move to do so in limine.

### F. Qualified Immunity

Defendants assert a defense of qualified immunity, which grants individual defendants immunity from suit under § 1983 unless they had "fair warning" that they were violating the law as it existed at the time of the events giving rise to the lawsuit. *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). However, defendants devote little space in their briefs to this question, which is not surprising. In cases in which the court of appeals has concluded that a reasonable jury could find that the defendants were deliberately indifferent to a risk that an inmate would commit suicide, the court has given short shrift to claims of qualified immunity.

In *Hall v. Ryan,* 957 F.2d 402, 405 (7th Cir.1992), one of this circuit's first jail suicide cases, the court held that "it was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk." *See also id.* ("prison officials are not entitled to [a qualified immunity] defense ... if they are aware of a risk of injury to an inmate and nevertheless fail to take appropriate steps to protect the inmate from that known danger.... A plaintiff with known suicidal tendencies obviously falls within this rule.") The court has similarly characterized the right at issue in subsequent cases. *Sanville,* 266 F.3d at 740–41 ("There can be little debate that it was clearly established, long before 1998, that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk.") (quoting *Hall,* 957 F.2d at 406.); *Cavalieri,* 321 F.3d at 623–24 ("The rule that officials, including police officers, will be liable under section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk was clearly established prior to 1998.") (Citation omitted).

It appears that the Court of Appeals for the Seventh Circuit has taken a view similar to that of the Court of Appeals for the Eleventh Circuit, that a "finding of deliberate indifference necessarily precludes a

finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186 (11th Cir.1994). Accordingly, because a reasonable jury could find that each of the defendants was deliberately indifferent to a substantial risk that plaintiff would attempt to commit suicide, I conclude that defendants are not entitled to qualified immunity.

## ORDER

IT IS ORDERED that

1. The motion filed by plaintiffs Brenda Mombourquette, Tammy Mombourquette, E.S. and C.S. to supplement their summary judgment materials is DENIED as unnecessary.

2. Defendant David Schaldach's motion in limine to exclude evidence of his sexual activity with other inmates is DENIED.

3. The motion for summary judgment filed by defendants Charles Amundson, Candace Warner, Sandi Wegner, Anna Janusheske, Mike Wildes, Janita Leis, Sue Weiman and Patricia Fish is DENIED.

4. Defendant Schaldach's motion for summary judgment is DENIED.

5. Defendant Jeanne Reinart's motion for summary judgment is DENIED. Entered this 12th day of January, 2007.