In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-2072

CORNEL J. ROSARIO, as Special Administrator of the
Estate of Marc J. Rosario, deceased,

*Plaintiff-Appellant,*

*v.*

DANIEL R. BRAWN, JEFFREY A. SCHWITZ, and
ADAM C. WINKLER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-C-0590—**Patricia J. Gorence**, *Magistrate Judge.*

ARGUED OCTOBER 31, 2011—DECIDED MARCH 1, 2012

Before KANNE and WILLIAMS, *Circuit Judges*, and
DEGUILIO, *District Judge.*\*

KANNE, *Circuit Judge*. In May 2008, Washington
County Sheriff deputies responded to a call indicating

---

\* The Honorable Jon E. DeGuilio, United States District Court
for the Northern District of Indiana, sitting by designation.

that Marc Rosario had left the home he shared with his parents, and that he was possibly a danger to himself and others. The responding officers located Marc and eventually determined that he should be involuntarily committed pursuant to Wis. Stat. § 51.15. During Marc's initial evaluation at a nearby hospital, the officers discovered a nylon wallet on Marc's person, but their search was not thorough enough to discover that the wallet contained a concealed razor blade. Later that morning while still in police custody, Marc regained possession of the razor blade during his transport from the hospital to the Winnebago Mental Health Institute. As he sat quietly in the back seat of the squad car, Marc used the concealed razor blade to commit suicide. As Special Administrator to Marc's estate, Marc's father, Cornel Rosario filed a § 1983 suit alleging that the officers were deliberately indifferent towards Marc's risk of suicide in violation of the Fourteenth Amendment. Finding that Rosario could not overcome the high hurdle imposed by the deliberate indifference standard, the district court entered summary judgment for the defendants. We affirm.

## I. BACKGROUND

Although tragic, the facts here are generally undisputed. Just after midnight on May 8, 2008, Cornel Rosario called the Washington County, Wisconsin Sheriff's Department to report that his son Marc had just left home and was possibly a danger to himself and others. Deputy Daniel Brawn took the call at which time the dispatcher

informed Brawn that Marc had access to knives. At approximately 1:06 a.m., Deputy Brawn located Marc a short distance from the Rosario home. After Deputy Brawn made contact with the subject, Marc explained that he was undergoing a "transformation" into a "fire-flying serpent." Deputy Brawn also noticed the highly unusual rate at which Marc was consuming water. Clearly concerned with Marc's mental state, Deputy Brawn contacted his supervisor, Sergeant Ryan Herman, to discuss the best course of action, including whether it was prudent to involuntarily commit Marc pursuant to Wis. Stat. § 51.15.[1] Sergeant Herman and Deputy Brawn agreed that Marc should initially be taken to the Acute Care Services division of the Washington County Department of Human Services ("ACS") for further evaluation before making a § 51.15 determination.

To transport Marc to ACS, Deputy Brawn placed Marc in handcuffs. Because of Marc's larger stature, Deputy Brawn used two sets of handcuffs to make Marc more comfortable—one cuff was placed on each wrist and joined in the middle of Marc's back. Before placing Marc in his squad car, Deputy Brawn searched Marc during which he located and removed a three-to-four-inch pocket knife, a cigarette lighter, and a chain wallet containing a large amount of cash. After the

---

[1] Under Wisconsin law, "A law enforcement officer . . . may take an individual into custody if the officer . . . has cause to believe that the individual is mentally ill, is drug dependent, or is developmentally disabled . . . ." Wis. Stat. § 51.15(1)(a).

search, Marc agreed that speaking with a priest at Holy Hill Basilica might calm his nerves. Deputy Brawn and Deputy Michael Anderson transported Marc to Holy Hill at approximately 1:38 a.m., only to find that a priest was unavailable. A few minutes later, ACS mental health specialist, Matt Wiedmeyer, arrived at the church in an attempt to further assess Marc's condition. Unable to gather any information from Marc, Wiedmeyer departed twenty minutes later. At 2:30 a.m., Marc was given permission to step out of the squad car to stretch his legs. Deputy Brawn also stepped away momentarily to discuss Marc's condition with officers who had spoken with Marc's parents. Out of the car but still in handcuffs, Marc repositioned his hands in such a way that allowed him to break his eyeglass lenses. Marc then attempted to use the broken lenses to cut his wrists, but Deputies Anderson and Brawn restrained Marc before he harmed himself.

Based on the totality of Marc's behavior, Deputy Brawn was now convinced that Marc should be involuntarily detained according to § 51.15. Deputies Brawn and Anderson transported Marc to St. Joseph's Hospital for a preliminary medical screening. Deputy Adam Winkler and Wiedmeyer met Deputies Brawn and Anderson at the hospital. On the way to St. Joseph's, Deputy Brawn kept the squad car's interior dome light on to monitor Marc. Marc behaved normally during the transport. Upon arriving, Marc was taken to an examination room, where both of his wrists were handcuffed to the bed rails. For approximately three hours, Dr. James Erickson and several nurses monitored Marc and per-

formed various medical tests. Marc generally cooperated with each procedure, although he occasionally leaned over the bed railing at a forty-five degree angle. Seeing this unusual movement, Deputy Brawn asked Marc if everything was okay, at which point Marc resumed sitting on the bed in a normal, upright position. Another time, Marc gave a thumbs-up response to Deputy Brawn after being asked whether everything was okay.

Marc's only other movement during his examination was when he used one of his hands to motion to his left rear pants pocket. Noticing Marc's hand, Deputy Winkler went to Marc's bedside and removed a thin, nylon tri-fold wallet, which had not been discovered during Deputy Brawn's previous pat-down search. Deputy Winkler removed the contents of the wallet, which included cash, a plastic card similar to a credit card, and a small silver foil packet. Of the officers in the hospital room, only Deputy Winkler held the foil packet, which the contents to him felt soft. Deputy Brawn commented that the foil packet resembled a Band-Aid. The deputies never actually opened the foil packet even though one side of the package contained the words "Surgical Blade." Had Deputy Winkler or anyone else actually opened the foil packet, they would have discovered a small razor blade consistent with the writing on the package. The parties agree that the deputies did not read the "Surgical Blade" text or realize that the packet actually contained a razor blade. Having satisfied himself with his inspection, Deputy Winkler placed each item back in the nylon

wallet and placed the wallet inside one of Marc's shoes, which were located on the floor at the foot of Marc's bed. Before leaving the hospital, Marc regained possession of his wallet, and thus, the razor blade. Although there is some dispute whether a St. Joseph's nurse returned the wallet to Marc or Marc himself simply placed it in his pocket, the only relevant fact for our purposes is that Marc regained possession of the razor blade. The parties do not dispute that the Sheriff's Department formally disciplined Deputies Brawn and Winkler in part for failing to observe Marc regain possession of his wallet.

At the conclusion of the St. Joseph's examination, the Winnebago Mental Health Institute in Oshkosh agreed to accept Marc for admission as a § 51.15 patient. Deputy Jeffrey Schwitz assisted Deputy Brawn with Marc's transport to Oshkosh. Before leaving, the deputies placed Marc in belly chains—a type of restraint where individual cuffs attach to a steel chain placed around the person's waist. Deputy Schwitz twice searched the rear of the squad car for weapons or other foreign objects before allowing Marc to enter. The officers did not search Marc's person before leaving for Oshkosh.

During the trip from St. Joseph's to Winnebago Mental Health Institute, Deputy Schwitz drove, Deputy Brawn sat in the front passenger seat, and Marc sat in the back seat. In the squad car, a solid steel partition containing a sliding Plexiglas and mesh panel separated Marc from the deputies. Because of the divider, the depu-

ties were unable to observe Marc's hands during transport, although Deputy Schwitz could observe Marc's face through the rearview mirror. Additionally, Deputy Brawn occasionally asked Marc if he was okay, to which Marc responded affirmatively by grunting or sitting upright. Deputy Brawn, turning his head toward the back seat, also noticed that Marc would sometimes lean to one side of the squad car, but Deputy Brawn considered such movements to be normal during longer trips. Neither officer noticed any unusual behavior from Marc until he slumped over in the back seat. As Marc slumped over, Deputy Schwitz noticed that Marc's face and neck were covered in blood. Seeing Marc's injuries, Deputy Schwitz activated the car's emergency lights and drove to the Winnebago County Sheriff's Department. Meanwhile, Deputy Brawn placed a 911 call requesting that an ambulance meet the squad car in the Sheriff's Department's parking lot. Upon the deputies' arrival, they both got out of the vehicle and attempted to administer first aid to Marc, including placing a large gauze bandage on his open wounds. Marc fought the deputies' efforts and he even managed to tear off the bandage. The paramedics took over Marc's medical care when they arrived, but Marc ultimately died in the parking lot of self-inflicted wounds to his neck. Marc had used the razor blade from the foil packet to cut himself.

As the Special Administrator for his son's estate, Cornel Rosario brought a 42 U.S.C. § 1983 suit against Deputies Brawn and Schwitz and former Deputy

Winkler (collectively, the "defendants" or "officers") alleging the officers were deliberately indifferent to Marc's risk of suicide in violation of the Fourteenth Amendment. The defendants moved for summary judgment on June 15, 2010. By the consent of the parties, Magistrate Judge Gorence considered the motion and granted summary judgment in favor of the defendants. Cornel Rosario filed this timely appeal.

## II. ANALYSIS

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review grants of summary judgment *de novo*, *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 690 (7th Cir. 2010), viewing the record in the light most favorable to Rosario and drawing all reasonable inferences in his favor, *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Although we have previously cautioned against weighing evidence at summary judgment, *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010), we have also said that "a factual dispute is 'genuine' only if a reasonable jury could find for either party," *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). On appeal, Rosario primarily argues that the district court erred by granting summary judgment for the defendants. Rosario also preemptively argues that the officers are not entitled to qualified immunity.

*A.  Deliberate Indifference*

The Eighth Amendment's ban on cruel and unusual punishment includes a proscription against deliberately indifferent treatment towards prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Although the Eighth Amendment applies only to convicted persons, pretrial detainees . . . are entitled to the same basic protections under the Fourteenth Amendment's due process clause," and we apply the same deliberate indifference standard in both types of cases. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). That said, a successful § 1983 deliberate indifference claim requires Rosario to prove that "(1) the harm that befell the prisoner [is] objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). In suicide cases, the objective element "is met by virtue of the suicide itself, as it goes without saying that suicide is a serious harm." *Id.* (*quoting Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001)). As such, Rosario turns our attention to the second element, where we have long required a dual showing in prison-suicide cases. Namely, Rosario must prove that the defendants "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Minix*, 597 F.3d at 831 (*quoting Collins*, 462 F.3d at 761). For purposes of summary judgment, the officers acknowledge that they subjectively knew Marc was at a substantial risk of committing suicide. Thus, the only

issue for our review is whether Rosario satisfied his summary judgment burden by showing that the officers intentionally disregarded Marc's risk of suicide.

Rosario's hope for reversal rests almost entirely on his misinterpretation of a district court opinion in *Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007), and the cases on which it relied, *see, e.g., Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006); *Sanville*, 266 F.3d at 737. The district court in *Mombourquette* correctly concluded that a defendant can be found liable for deliberate indifference if she was aware of the risk and did not respond reasonably to that risk. *Id.* at 637. But, Rosario's reading of *Mombourquette*, *Borello*, and *Sanville* clings to the *reasonableness* of the officers' actions in an apparent attempt to equate the deliberate indifference standard with a negligence standard. In doing so, he highlights three instances where the officers acted unreasonably: (1) they failed to fully inspect the foil packet containing the razor blade; (2) they allowed Marc to regain possession of the foil packet; and (3) they failed to monitor Marc during the trip to Winnebago Mental Health Institute. To Rosario, each action was unreasonable in light of what the officers knew about Marc's condition.

As a threshold matter, Rosario is wrong to focus so heavily on *Mombourquette*'s use of the term reasonable. Although we require that prison officials act reasonably when presented with a detainee's substantial risk of harm, *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002), we do not assess the officers' actions

according to a mere negligence standard. To the contrary, we have consistently held that deliberate indifference "requires a showing of more than mere or gross negligence." *Collins*, 462 F.3d at 762 (*quoting Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)); *see also Borello*, 446 F.3d at 749; *Woodward v. Corr. Med. Servs. of Ill.*, 368 F.3d 917, 926 (7th Cir. 2004); *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir. 1998); *Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). And *Mombourquette* is no different. 469 F. Supp. 2d at 637 ("The deliberate indifference standard requires more than a finding of negligence but less than a showing of intentional harm."). We have even characterized the standard as imposing a high hurdle on plaintiffs because it requires a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Collins*, 462 F.3d at 762 (citation and quotation marks omitted). In other words, the officers may escape liability even if they did not take perfect action. *See Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (defendant's "action must be reckless before § 1983 liability can be found"); *Peate*, 294 F.3d at 882 ("Prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

With the correct deliberate indifference standard in hand, we agree with the district court that Rosario presented little evidence suggesting that the officers acted recklessly or that they deliberately ignored Marc's

suicidal tendencies. Instead, the overall picture of the officers' actions towards Marc is one of protection and compassion. For example, Deputy Brawn searched Marc on contact and removed a pocket knife from his possession; Deputy Brawn took Marc to Holy Hill Basilica in an effort to relax Marc; the officers allowed Marc to stretch his legs at Holy Hill; an ACS mental specialist was called to the scene to assess Marc's condition; the officers immediately sought medical attention when Marc displayed self-destructive behavior at Holy Hill; Marc was placed in two sets of handcuffs during the first transport and then belly chains during the second transport in order to make his ride more comfortable; Deputy Brawn kept the police cruiser's dome light on during the trip to St. Joseph's as a means of monitoring Marc; Deputy Brawn asked Marc at St. Joseph's whether he was comfortable or whether he was feeling okay; similarly, Deputy Brawn occasionally asked Marc if he was okay during the trip to Oshkosh; Deputy Brawn immediately radioed for medical help when Marc started bleeding; and both deputies personally administered first aid to Marc in spite of his resistance.

Admittedly, the officers' actions were not perfect. Specifically, the officers should have paid greater attention to the objects in Marc's nylon wallet and they should have immediately inventoried the wallet for safekeeping. But this inattention to detail, although ultimately tragic, does not support a constitutional claim that the officers intentionally disregarded Marc's known safety risks. We do not require perfection.

*Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). Rather, we require Rosario to prove that the officers' conduct was "something approaching a total unconcern" for Marc's welfare, *Collins*, 462 F.3d at 762, and evidence of such mistreatment is absent. The undisputed record reveals Deputy Winkler felt the foil packet and noted that it felt soft. Likewise, Deputy Brawn commented that the packet appeared to be a Band-Aid. The fact that the deputies were concerned enough to search Marc's person and inspect the contents of the wallet contradicts Rosario's theory that the officers were deliberately indifferent to Marc's condition. The record also does not suggest that either deputy was reckless in permitting Marc to regain possession of his wallet. Rather, Deputy Winkler specifically placed the wallet in Marc's shoe as a means of keeping the items away from the still-handcuffed Marc. Even though the officers took their eyes off the wallet for some period of time, that evidence does not support an inference that the officers recklessly allowed Marc to harm himself. Throughout their time with Marc, the officers plainly did more right than wrong. When we review the totality of their actions that night, we conclude that the officers did not act with deliberate indifference even if there were isolated missteps along the way.

## B. Qualified Immunity

Rosario also preemptively argues that the officers are not entitled to qualified immunity. The district court appropriately did not consider this argument because

Rosario did not establish that the officers deprived Marc of a constitutional right. Because we find that the officers did not deprive Marc of his Fourteenth Amendment right to due process, we need not consider Rosario's argument. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011).

### III. CONCLUSION

We hold that Rosario did not produce sufficient evidence tending to show that the officers were deliberately indifferent towards Marc's risk of suicide. Because no reasonable jury could find in Rosario's favor, we AFFIRM the district court's grant of summary judgment for the defendants.