In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 19-3038

JAMES A. DONALD,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC., ANTHONY CARTER, and KURT OSMUNDSON,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 16-1481 — **James E. Shadid**, *Judge.*

---

ARGUED OCTOBER 2, 2020 — DECIDED DECEMBER 1, 2020

---

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* When James Donald entered prison, he had two eyes. Now he has one. The immediate cause of the loss of his left eye was an aggressive bacterial infection, but Donald argues that the substandard care of two prison doctors is to blame. He sued the doctors (and one of their employers) for deliberate indifference under the Eighth Amendment and medical malpractice under Illinois law. The district court

granted summary judgment in favor of the defendants on the federal claims and one of the malpractice claims. It then relinquished jurisdiction over the remaining state-law claims.

We agree that summary judgment was proper because (1) the undisputed evidence shows that the defendants did not act with deliberate indifference toward an objectively serious medical condition and (2) the district court appropriately exercised supplemental jurisdiction to dispose of the malpractice claim. We therefore affirm the district court.

## I. BACKGROUND

James Donald has an unfortunate ocular history. He has glaucoma, a common condition that causes increased pressure in the eyes, and he also has keratoconus, a thinning of the cornea that causes distorted vision. And, to treat his keratoconus, Donald had left-eye corneal transplant surgery in 2011.

A few years later, Donald was convicted of drug crimes, and he began his prison sentence at Illinois River Correctional Facility in Canton, Illinois, in September 2014. Before long, his eye problems started flaring up, causing redness and poor vision. So he went to see one of Illinois River's optometrists, Dr. Anthony Carter, on October 2, 2014.[1] Dr. Carter examined Donald, noted that his corneal transplant "looked excellent," and referred him to Illinois Eye Center in Peoria for an evaluation and a fitting for the contact lens he wore in his left eye.

Per Dr. Carter's referral, Donald went to Illinois Eye Center on October 27, 2014, and saw Dr. Steven Sicher, an

---

[1] Dr. Carter was employed by an entity called Eye Care Solutions, which subcontracts with Defendant Wexford Health Sources, Inc., to provide care to Illinois River inmates. It is not a party to this case.

ophthalmologist who specializes in the cornea and external diseases. Dr. Sicher assessed Donald's corneal transplant and found that it was doing well with no signs of graft rejection. Donald also had normal intraocular pressure. Dr. Sicher recommended no changes in care and suggested that Donald continue using eye drops. He also suggested that Donald see the physician who performed his corneal transplant surgery, Dr. Catharine Crockett, "in four months." He did not recommend that Donald see Dr. Crockett for any particular reason other than for "follow-up maintenance of [his] corneal transplant and keratoconus" because "continuity of care is important." Dr. Sicher also recommended that the prison continue to obtain Donald's contact lenses; apparently, he did not realize that part of the reason Donald had been sent to him was to obtain the prescription for those lenses.

When Donald returned to Illinois River, Dr. Carter did not schedule a follow-up appointment with Dr. Crockett because he didn't think it was necessary; both he and Dr. Sicher had concluded that Donald's eye conditions were stable. And because Dr. Sicher did not provide Donald's contact prescription, Donald filled out a records release form, and Dr. Carter received Donald's prescription on November 25, 2014. He approved a supply of lenses the next week and then attempted to contact Dr. Crockett's office to process the order. But despite several attempts and "many calls and letters," his staff could not get ahold of Dr. Crockett.

Strangely, during this same period, the Illinois Department of Corrections received a letter from Dr. Crockett stressing the importance of proper treatment and medication for Donald's corneal transplant. The letter also indicated that Donald needed a contact lens "for vision in his left eye."

Donald had apparently told his family that he wasn't getting proper care, and his family told Dr. Crockett. There is no deposition from Dr. Crockett in the record and no evidence that she knew the prison was attempting to get in touch with her or obtain new contacts for Donald. In any event, Donald finally received new lenses in February 2015.

When Donald visited Dr. Carter again in May 2015, his eye pressure had increased because of his glaucoma, so Dr. Carter approved a refill of his eye-pressure medication. Dr. Carter continued to monitor Donald's eye pressure and supply medication over the next two months. By July 30, Donald's eye pressure had improved significantly.

On September 17, 2015, Donald reported that his left eye had been red for two weeks, without irritation. Upon examination, Dr. Carter saw that the vision in Donald's left eye had improved and his corneal transplant was stable, but he also had a papillary reaction—an allergic or histamine response that causes bumps to form under the eyelids. Dr. Carter diagnosed allergic conjunctivitis in Donald's left eye and suspected that it was caused by either Donald's eye drops or contact lens solution. Dr. Carter instructed Donald to stop using his contacts for a few days to see if his condition improved.

A week later, on September 24, 2015, Donald's eye was still red, still without irritation. Dr. Carter did not suspect corneal rejection because the redness was generalized rather than concentrated around the cornea. Donald's eye pressure had also continued to improve, his transplant looked good, and there were no signs of infection. He changed Donald's eye drops to see if they were causing the reaction and told Donald to come back the next month. That was the last time Donald saw Dr. Carter.

On October 19, 2015, Donald saw Dr. Kurt Osmundson for the first time. Dr. Osmundson is a doctor of osteopathic medicine and is employed by Defendant Wexford Health Sources, Inc. ("Wexford"), which provides medical care to inmates at Illinois prisons. At this visit, Donald complained about increased pain and decreased vision. His left eye was cherry red in color, and he noticed some "matter in his eye." Dr. Osmundson, who was aware of Donald's ocular history, diagnosed a corneal ulcer and made an urgent referral to an offsite ophthalmologist.

Donald was immediately transferred to Illinois Eye Center, but no ophthalmologists were in the office that day. Instead, an optometrist,[2] Dr. Jacqueline Crow, examined Donald's eye and observed redness, swelling, and poor vision. Because she was not a cornea specialist, she called Dr. Sicher to discuss her observations.[3] Dr. Sicher concluded that Donald's symptoms were more consistent with a corneal graft rejection than an ulcer. Based on her consultation with Dr. Sicher, Dr. Crow entered a diagnosis of corneal graft rejection. She also recommended that Donald change eye drops and that he return to see Dr. Evan Pike, an ophthalmologist and cornea specialist, in two or three days.

When Donald returned to Illinois River—and following Dr. Crow and Dr. Sicher's diagnosis and recommendations—Dr. Osmundson immediately ordered the change in eye drops

---

[2] Optometrists provide routine eye care and, unlike ophthalmologists, are not medical doctors.

[3] Dr. Crow first asked the transporting guards if they could move Donald to the office where Dr. Sicher was located, but the request was denied. The record does not reflect who denied the request.

and scheduled the follow-up appointment with Dr. Pike. He also admitted Donald to the infirmary so he could be monitored in the meantime.

A few days later, on October 22, 2015, Dr. Pike examined Donald and diagnosed a left-eye corneal ulcer caused by a bacterial infection. He could not determine if the infection and the previously diagnosed graft rejection were related, but in any event, he was forced to treat both conditions at the same time. He therefore ordered antibiotic drops to treat the infection and steroid drops to treat the graft rejection. He asked Donald to return in five to seven days after the medication had some time to kick in.

That day, Dr. Osmundson wrote the order recommended by Dr. Pike, and the record indicates that Donald received the prescribed eye drops from a nurse that evening.[4]

Over the next three days, Donald reported that he had no vision, yellow drainage, and immense pain, all in his left eye. By October 26, nursing staff confirmed increased pain, bleeding, and drainage. Nurses contacted Dr. Osmundson, who directed them to call Illinois Eye Center for instructions. Donald was immediately transferred there and seen by Dr. Sicher.

Dr. Sicher diagnosed a rupture of the globe: "the corneal graft had come off and … there was a wide opening in the front of his eye with protrusion of iris and intraocular contents through the opening in the front of his eye." This was, in Dr. Sicher's words, "an irreversible loss of vision. It's basically a disaster." Dr. Sicher performed surgery to remove Donald's

---

[4] The nurse and Donald both confirmed this in their depositions, and the nurse documented delivery of the medication that day. Donald's claim on appeal that he did not promptly receive eye drops is unsupported.

left eye. After surgery, pathological tests revealed that the infection that led to the ruptured globe was caused by pseudomonas aeruginosa, bacteria that can act very quickly and cause perforation in as few as seventy-two hours.

On December 16, 2016, Donald sued Dr. Carter, Dr. Osmundson, and Wexford. He brought claims under 42 U.S.C. § 1983 for deliberate indifference to a serious medical need in violation of the Eighth Amendment and for medical malpractice under Illinois law.

During discovery, the defendants jointly submitted an expert report from Dr. Lisa Nijm, an ophthalmologist and cornea specialist, who opined that, to a reasonable degree of medical certainty, the earliest indication of a possible corneal rejection or infection would have appeared on October 18, 2015, three weeks after Donald had last seen Dr. Carter. She also explained that there was appropriate monitoring and treatment of Donald's symptoms at all times prior to his infection and that there is no connection between glaucoma (or its treatment) and the development of an ulcer.

Dr. Carter also submitted an expert report from Dr. Julie DeKinder, an optometrist, who explained that (1) Dr. Carter's treatment was appropriate and within the standard of care, (2) an optometrist is qualified to treat a patient exhibiting Donald's symptoms and would not be expected to refer a patient with those symptoms to an ophthalmologist, (3) Dr. Carter's diagnosis of allergic conjunctivitis was consistent with Donald's symptoms at the time, (4) there was no evidence that Donald was suffering from a corneal infection or rejection at any time that he saw Dr. Carter, and (5) the serious condition that resulted in Donald's eye loss was unrelated to the conditions managed by Dr. Carter.

Donald also engaged an expert, Dr. Melvin Ehrhardt, but his testimony was limited to "managing inmate care" and "coordinated care and communication within a prison setting." He was not admitted as an expert in optometry, ophthalmology, corneal transplants, keratoconus, or corneal ulcers. Dr. Ehrhardt opined that Donald showed signs of infection and graft rejection and that the defendants breached the standard of care by, among other things, failing to promptly refer Donald to a specialist and failing to provide medications on a timely basis.

After discovery, the defendants moved for summary judgment. The district court granted the defendants' motions with respect to the deliberate indifference claims and exercised its supplemental jurisdiction to grant summary judgment on the malpractice claim against Dr. Carter. The court relinquished jurisdiction over the remaining state-law claims against Dr. Osmundson and Wexford. Donald then filed this appeal.

## II. ANALYSIS

We review the district court's order granting summary judgment *de novo*. *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) (citing *Ga.-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011)). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' We 'consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment.'"

*Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); and then quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996)).

Donald's primary contention on appeal is that the district court erred in granting summary judgment on his § 1983 claims for deliberate indifference to a serious medical condition in violation of the Eighth Amendment. "'[D]eliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To succeed on his claims, Donald "must establish '(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition.'" *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Arnett v. Webster*, 658 F.3d 742, 750, 751 (7th Cir. 2011)).

The first, objective element is satisfied by showing that the plaintiff suffered from a condition "that 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The second element of "[d]eliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Gomez*, 680 F.3d at 865 (quoting *Arnett*, 658 F.3d at 750). This has been called a "high hurdle," *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012), and an "exacting" standard, *Johnson v. Doughty*, 433 F.3d 1001, 1018 n.6 (7th Cir. 2006) (citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th

Cir. 1996)); it requires "something approaching a total uncon-
cern for the prisoner's welfare in the face of serious risks," *Ro-
sario*, 670 F.3d at 821 (quoting *Collins v. Seeman*, 462 F.3d 757,
762 (7th Cir. 2006)). A defendant must make a decision that
represents "such a substantial departure from accepted pro-
fessional judgment, practice, or standards, as to demonstrate
that the person responsible actually did not base the decision
on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir.
2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988
(7th Cir. 1998)).

With this framework in mind, we analyze Donald's claims
against each defendant in turn.

### A. Claims Against Dr. Carter

The district court granted summary judgment in favor of
Dr. Carter on Donald's deliberate indifference claim because
Donald did not have an objectively serious medical condition
while in Dr. Carter's care and because Dr. Carter provided ad-
equate treatment. The court also exercised its supplemental
jurisdiction to grant summary judgment in favor of Dr. Carter
on Donald's Illinois tort claim. While some of our reasoning
differs, we agree with the district court's order granting sum-
mary judgment in favor of Dr. Carter.

### 1. Deliberate Indifference

The district court granted summary judgment in favor of
Dr. Carter on Donald's deliberate indifference claim for two
reasons. First, the court found that Donald failed to show that
he suffered from a serious medical condition. The court ex-
plained that conjunctivitis is not a serious medical condition,
and "no qualified medical expert or medical provider has pro-
vided evidence [that Donald] suffered from anything other

than conjunctivitis in September of 2015" or that conjunctivitis was linked to the loss of Donald's eye. Second, the district court found that even if conjunctivitis were a serious condition, Donald offered no evidence to show that Dr. Carter's treatment represented a "substantial departure from accepted professional judgment, practice, or standards" such that it would amount to deliberate indifference. *Id.* (quoting *Collignon*, 163 F.3d at 988).

We do not completely agree with the district court's first conclusion. Although other courts have found that conjunctivitis alone is not a serious medical condition, *see Potter v. Deputy Att'ys Under Abraham*, 304 Fed. App'x 24, 28 (3d Cir. 2008), Donald did not have conjunctivitis alone. It's true that Donald generally lacks medical testimony from a qualified expert to establish that he had an objectively serious condition while in Dr. Carter's care. But the conclusion that Donald did not suffer "from anything other than conjunctivitis" at the relevant time somewhat oversimplifies the matter.

It is undisputed that, since before entering prison, Donald suffered from glaucoma and keratoconus, the latter of which was treated with a corneal transplant. Add those ailments to the conjunctivitis later diagnosed by Dr. Carter, and it's clear that Donald's eye condition was more complex than your average patient's. And it's possible that the combination of these afflictions created a condition serious enough to satisfy the objective requirement of a deliberate indifference claim. *Gayton*, 593 F.3d at 620 ("A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.").

In fact, we have previously indicated—albeit in an un-published order—that glaucoma "is manifestly a sufficiently serious medical condition to satisfy the objective element of the deliberate indifference standard." *O'Banner v. Bizzell*, 151 F.3d 1033, *2 (7th Cir. 1998) (nonprecedential). Keratoconus, too, has been found to be a serious medical condition. *See Nunez v. Spiller*, No. 15-CV-00514-SMY, 2015 WL 3419513, at *2 (S.D. Ill. May 28, 2015); *Marshall v. Nickel*, No. 06-C-617-C, 2007 WL 5582139, at *5 (W.D. Wis. Jan. 29, 2007). And the same goes for a stable corneal transplant. *Spencer v. Kokor*, No. 117CV00597LJOJLTPC, 2018 WL 1305742, at *3 (E.D. Cal. Mar. 13, 2018); *see Henley v. Richter*, No. 11-CV-89, 2013 WL 1288035, at *12 (E.D. Wis. Mar. 26, 2013) ("[Defendants] con-cede that [Plaintiff's] corneal transplant constitutes a serious medical need … .").

In addition, some evidence in the record supports that Donald's eye afflictions required ongoing monitoring, if not actual treatment, which indicates a serious medical condition. *Gayton*, 593 F.3d at 620. For example, the letter from Dr. Crockett advised that Donald needed to be "regularly as-sessed for any transplant rejection," and Dr. Carter sent Don-ald to an outside ophthalmologist for an evaluation.

Though Donald failed to put forth expert testimony estab-lishing that he had an objectively serious condition while in Dr. Carter's care, and such testimony would have been bene-ficial, Donald had an undoubtedly unique combination of eye conditions, most of which have been deemed objectively seri-ous even in isolation. We therefore assume without deciding that Donald had a serious medical condition while in Dr. Carter's care. *See Bone v. Drummy*, No. 2:12-CV-80-WTL-WGH, 2014 WL 3566576, at *4 (S.D. Ind. July 18, 2014)

("[P]reexisting and underlying eye issues," including g lau-coma and keratoconus, "are objectively serious medical con-cerns.").

But that's only half the inquiry. Donald must also show that Dr. Carter acted with deliberate indifference toward the risk posed by that serious condition. *Arnett*, 658 F.3d at 750. And we agree with the district court's second conclusion that Donald did not show that Dr. Carter acted with deliberate in-difference.

The evidence compels this conclusion. Expert testimony established that Donald's symptoms while in Dr. Carter's care—generalized redness with no irritation—were con-sistent with Dr. Carter's diagnosis of conjunctivitis. Expert testimony also established that optometrists like Dr. Carter are qualified to treat conjunctivitis, along with a stable corneal transplant and glaucoma, and that Dr. Carter acted within his duty of care when treating these conditions. Indeed, the rec-ord shows that Dr. Carter successfully treated Donald's glau-coma by reducing his eye pressure and continually monitored the status of his corneal transplant. And expert testimony es-tablished that any indication of corneal rejection or infection would have appeared no earlier than October 18, 2015—three weeks *after* Dr. Carter last saw Donald—so Dr. Carter could not have known about, let alone disregarded, the risk of harm posed by these other ailments.

Donald marshalled no expert testimony to contradict the above evidence that Dr. Carter appropriately monitored and treated Donald's various eye conditions. The one expert Don-ald did retain, Dr. Ehrhardt, was admitted to opine only on "coordinated care and communication within a prison set-ting." But the district court made clear that Dr. Ehrhardt "is

not qualified to testify as an optometrist or ophthalmologist concerning specific eye care or conditions," so his testimony cannot support Donald's assertions that his symptoms "were consistent with graft rejection or infection of the eye" or that Dr. Carter should have referred Donald to a "qualified corneal specialist physician in light of the complexity of his condition." We therefore reject Dr. Ehrhardt's inadmissible statements concerning supposed signs of infection or graft rejection and the need for Dr. Carter to promptly refer Donald to a cornea specialist or provide certain medications. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion, … a party may rely only on admissible evidence. This rule applies with equal vigor to expert testimony." (citing, among other cases, *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993))).

Given his lack of admissible expert testimony, Donald resorts to arguing about the delay in receiving his contact lenses, which he attributes to Dr. Carter. First off, the record shows that Dr. Crockett's office, not Dr. Carter, was the cause of the delay. At any rate, Donald also fails to explain how that delay is relevant or how it had anything to do with his later eye problems. Worse, Donald borders on misrepresenting the record by repeatedly suggesting that these lenses were "prescribed to treat his serious eye condition" and that he "could lose the corneal transplant if the lens … was not supplied." Those unfounded assertions stem from a mistaken assumption made by Dr. Ehrhardt, but Dr. Crockett's letter explained that the lenses were merely for improved vision: "[Donald] only sees adequately at distance with a myopic contact lens, so if you wish this patient to see anything or not be considered legally blind, you will supply him with the contact lens that he requires for vision in his left eye." What's more, Dr. Nijm

confirmed that wearing a contact lens only *increases* a patient's risk of developing a corneal ulcer.

All of this evidence shows that Dr. Carter did not act with deliberate indifference to any of Donald's conditions. The district court therefore appropriately granted summary judgment in favor of Dr. Carter on Donald's deliberate indifference claim.

### 2. *Medical Malpractice*

Next, we must determine whether the district court properly exercised supplemental jurisdiction over Donald's remaining state-law malpractice claim against Dr. Carter. Here, too, we apply *de novo* review. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499–500 (7th Cir. 1999).

When "the federal claim in a case drops out before trial," a district court usually "relinquish[es] jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008) (citing *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993)). But "judicial economy, convenience, fairness and comity may point to federal retention of state-law claims … when it is absolutely clear how the pendent claims can be decided." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

"Here, as in any medical malpractice action, [Donald] had the burden of establishing, through expert testimony, the standard of care applicable to [Dr. Carter], to identify the unskilled or negligent manner in which [Dr. Carter] deviated from that standard, and show a causal connection between that deviation and the injuries sustained." *Jones v. Chi. Osteopathic Hosp.*, 738 N.E.2d 542, 547 (Ill. App. 2000) (citing *Purtill*

*v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986); *Lloyd v. County of Du Page*, 707 N.E.2d 1252, 1258 (Ill. App. 1999)).

"The general rule is that expert testimony is required to establish" the above elements. *Prairie v. Univ. of Chi. Hosps.*, 698 N.E.2d 611, 615 (Ill. App. 1998). But Donald has no experts competent to testify about the standard of care for an optometrist, how Dr. Carter breached that standard, or how that breach caused Donald's injuries. Nor does he have any evidence to rebut the expert testimony that optometrists like Dr. Carter are qualified to evaluate and treat a stable corneal transplant, glaucoma, and conjunctivitis, and that Dr. Carter rendered appropriate care with respect to these conditions. And as explained, Donald lacks evidence that he showed any symptoms of an infection or a graft rejection at any point while in Dr. Carter's care, or even that such symptoms *could* have been present at that time.

Donald relies heavily on Dr. Ehrhardt's opinions, but again, these are largely inadmissible. To the extent his opinions are limited to the topic on which he was admitted to testify—"coordinated care and communication within a prison setting"—they mean nothing without admissible expert testimony that Donald's condition required more than what Dr. Carter provided or that Donald's condition at that time was connected to his eventual eye loss.

Donald also argues that Dr. Carter was negligent by failing to speedily procure new contact lenses and failing to follow Dr. Sicher's advice to schedule follow-up appointments with Dr. Crockett every four months. We have already rejected the first of these arguments. As for the second, Dr. Sicher never recommended that Donald see Dr. Crockett *every* four months; he suggested scheduling *one* appointment "in

four months" for general "continuity of care" purposes. Neither Dr. Sicher nor Dr. Carter saw any problems with Donald's transplant at the time, and Donald offers no admissible evidence that Dr. Carter's failure to schedule that check-up somehow breached the standard of care or caused Donald's eye loss a year later. He simply asserts that Dr. Carter was not qualified to provide routine post-operative care, but this is not supported by any testimony from an optometrist or ophthalmologist and is, in fact, flatly contradicted by Dr. DeKinder.

Given this dearth of evidence, expert or otherwise, Donald cannot prove the elements of an Illinois medical malpractice claim. It is thus "absolutely clear" that summary judgment was appropriate on Donald's malpractice claim against Dr. Carter in addition to the deliberate indifference claim. *Wright*, 29 F.3d at 1251.

### B. Claims Against Dr. Osmundson

The district court dismissed Donald's deliberate indifference claim against Dr. Osmundson because Donald lacked evidence showing that Dr. Osmundson acted with deliberate indifference. Again, we agree with the district court.

There is no dispute that by the time Donald first saw Dr. Osmundson on October 19, 2015, Donald had developed an objectively serious medical condition. The question is whether Dr. Osmundson responded to that condition with deliberate indifference.

An overview of Dr. Osmundson's actions shows that he was not deliberately indifferent to Donald's condition. First, he referred Donald to a specialist on an urgent basis the first time he examined him. He next carried out every recommendation made by Dr. Crow (in consultation with Dr. Sicher)

and admitted Donald to the infirmary to be monitored. Then, after Donald saw Dr. Pike, Dr. Osmundson executed each of *his* recommendations. And when he was informed that Donald's condition had deteriorated, he instructed nurses to contact Illinois Eye Center, and Donald was transferred there immediately. In short, Dr. Osmundson urgently referred Donald to an outside specialist at the first opportunity and approved every recommendation made by a specialist thereafter.

Donald strains to make Dr. Osmundson's above actions look like "'something approaching a total unconcern' for [Donald's] welfare." *Rosario*, 670 F.3d at 822 (quoting *Collins*, 462 F.3d at 762). His argument goes something like this: sure, Dr. Osmundson urgently referred Donald to an ophthalmologist, but Donald only saw an *optometrist*; Dr. Osmundson must have known that his order was not carried out and should have ensured that it was; he should not have "blindly accepted" Dr. Crow's graft-rejection "misdiagnosis," which delayed Donald's treatment and led to the loss of his eye; and he didn't *personally guarantee* that Donald received the eye drops that Dr. Pike recommended.

The first problem with these arguments is that there is no competent evidence to support them. Dr. Osmundson testified that he did not know Donald had not seen an ophthalmologist. Donald's assertion that a jury could find otherwise is empty, and in any event, Dr. Crow consulted with Dr. Sicher—an ophthalmologist—before rendering a diagnosis. The record reflects that Donald did, in fact, timely receive the eye drops that Dr. Osmundson prescribed. And the unrebutted expert testimony establishes that Dr. Osmundson acted appropriately in following the recommendations and diagnosis received from other doctors.

Second, as a legal matter, Donald's argument that Dr. Osmundson should have done more than "blindly accept" specialists' recommendations is unavailing. To be sure, "[d]eliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted) (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)) (citing *Arnett*, 658 F.3d at 753; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). But Donald points to no authority for the proposition that a doctor who *follows* the advice of a specialist, in circumstances like these, exhibits deliberate indifference.

Perhaps Donald could survive summary judgment if he had evidence that Dr. Osmundson knew that the advice he received from Drs. Crow, Sicher, or Pike was "blatantly inappropriate" and carried it out anyway. *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). But Donald has no such evidence, so he cannot fault Dr. Osmundson for following their recommendations.

Nor can Dr. Osmundson be liable under a theory that he didn't micromanage his nurses closely enough. "[N]othing in the record suggests that [any] nurse was anything less than attentive to [Donald's] condition." *Gilman v. Amos*, 445 F. App'x 860, 864 (7th Cir. 2011) (nonprecedential). Regardless, Dr. Osmundson could be liable only if he "kn[e]w about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). There is no

evidence that Dr. Osmundson knew of inadequate treatment—because there was none.

We therefore conclude that summary judgment in favor of Dr. Osmundson was proper.

### C. Monell *Claim Against Wexford*

Finally, we must determine whether the district court properly disposed of Donald's claim against Wexford for deliberate indifference under a *Monell* theory of liability. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (local governments can be held liable for § 1983 violations where the constitutional deprivation results from policy or custom). The district court granted summary judgment in favor of Wexford after concluding that Donald "failed to establish an underlying constitutional violation."

"[W]e've held that the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law," such as Wexford, where "'an official with final policy-making authority' acted for the corporation." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009)). But "if the plaintiff's theory of *Monell* liability rests entirely on individual liability," as Donald's does here, then "negating individual liability will automatically preclude a finding of *Monell* liability." *Id.* We therefore agree that summary judgment in favor of Wexford was appropriate because Donald failed to establish a deliberate indifference claim against Dr. Osmundson individually.

### III. CONCLUSION

For the above reasons, we AFFIRM the decision of the district court.